**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FULLERTON PUBLISHING COMPANY,**
d/b/a Daily News Tribune,
**Respondent.**

**No. 16821.**

United States Court of Appeals
Ninth Circuit.

Oct. 28, 1960.

Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Melvin Pollack, James A. Ryan, Attorneys, N.L.R.B., Washington, D. C., for petitioner.

O'Melveny & Myers, Roy E. Potts and Marshall A. Rutter, Los Angeles, Cal., for respondent.

Before STEPHENS, BARNES and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

Before us is a petition to enforce an order of the National Labor Relations Board. The order directed respondent to cease and desist from certain unfair labor practices, to reinstate former employee Fuller with back pay, and to post the usual notices. The hearing was initiated on charges filed with the Board by the Los Angeles Newspaper Guild, Local 69, American Newspaper Guild, AFL-CIO, acting on behalf of member Fuller. The trial examiner determined that respondent had committed unfair labor practices in the firing of Fuller because of his union activities, and in interrogating other newspaper employees as to their union membership. The findings and conclusions of the trial examiner were adopted by the Board in its formal decision, 125 N.L.R.B. No. 30

(1959), and this petition followed to enforce the Board's order. We have jurisdiction of this petition under Section 10 (e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e).

Respondent publishes an evening newspaper in Fullerton, California. One Andrew Fuller was employed as County Editor of the newspaper to head the county news department. As such he had the responsibility of filling the county news section of the paper, with the aim of getting the most important county news in that section. Under his direction were two fulltime reporters and three reporters on a regular part time basis.

Every morning when Fuller reported for work he was given a dummied-up county section from the advertising department to serve as a blueprint for the day's work. He had complete discretion to determine what county news to use to fill up his section. He assigned the reporters under him to cover county stories, and he was expected to criticize and advise the reporters in their work. He spent about half of his working hours editing the copy of the reporters under him, and the other half he acted as a reporter himself.

On one occasion when a reporter under the jurisdiction of the county editor did not properly perform his duties, Fuller was held responsible for the delinquent performance by the Managing Editor, Leif Johnson, and Fuller himself was required to complete the assignment. Further, the managing editor insisted that the reporter be reprimanded by Fuller.

Whenever a county news story appeared to merit a front page spread, Fuller notified Johnson and let him make that decision. But with this exception, the news that was placed in the county news section was solely Fuller's decision. The county coverage effected by Fuller was checked by Johnson by reading the final content in the published paper and comparing it with other newspapers in the area. Only in this way did Johnson check to see that Fuller had placed the most important county news in the county news section.

In October of 1958, the Los Angeles Newspaper Guild, Local No. 69, American Newspaper Guild, AFL-CIO, initiated a campaign to organize the employees in respondent's news department, all of whom were under the overall supervision of Managing Editor Johnson. Fuller attended several union meetings and joined on October 20, 1958. The next week Johnson heard a rumor of the organization drive, and began asking individual questions to the members of his department. He spoke to Fuller and five other department members, asking for the names of those who had joined the union, and asking one man to let him know if he heard anything. Fuller admitted his union membership to Johnson, but apparently no other fulltime employee of respondent had joined the union. Very shortly thereafter Fuller was summarily discharged by the respondent on the basis of an asserted economy measure.

■ In our view, the finding that Fuller was discharged because of his union activities is supported by substantial evidence on the record considered as a whole.

The Board concluded that since Fuller's discharge had been motivated by his union membership, it was an unfair labor practice, and concluded that the conduct of questioning the respondent's employees, followed by the discriminatory firing of Fuller, also constituted an unfair labor practice. Consequently, the Board ordered respondent to reinstate Fuller with back pay, and to cease and desist from further questioning of its employees concerning union membership.

In the petition to enforce its order, we are faced at the outset with the question of the Board's jurisdiction over this case. It is the contention of respondent that Fuller was a "supervisor" within the meaning of that term as it is employed in the National Labor Relations Act; and that therefore the Board had no jurisdiction to order Fuller's reinstatement or back pay allowances, and the Board had no jurisdiction to order re-

spondent to cease and desist from questioning its employees concerning their union affiliation and the progress of the union's organizing efforts.

■■■ The statutory definitions of an employee [1] and a supervisor [2] in the National Labor Relations Act are set out in the margin. In dealing with the statutory term "supervisor" it is well settled that an employee must be classified as a supervisor if he exercises any one of the powers set forth in Section 2(11) of the Act. N. L. R. B. v. Edward G. Budd Manufacturing Co., 6 Cir., 1948, 169 F. 2d 571, certiorari denied Foreman's Ass'n of Amer. v. Edward G. Budd Mfg. Co., 1949, 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441; Ohio Power Company v. N. L. R. B., 6 Cir., 1949, 176 F.2d 385, 11 A.L.R.2d 243, certiorari denied 1949, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553. As noted, respondent bottoms its case on the proposition that Fuller was a "supervisor". It is urged that he had authority "responsibly to direct" other employees, and that "in connection with the foregoing the exercise of such authority [was] not of a merely routine or clerical nature, but require[d] the use of independent judgment." It is to be noted that the trial examiner, and the Board, determined as a fact that Fuller was not a supervisor, but was an ordinary employee. While this is a finding of fact, it is nevertheless subject to the scrutiny outlined in Universal Camera Corporation v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Thus we turn to the question whether the record, considered as a whole, supports the finding of the Board that Fuller was not a supervisor.

The "supervisory" status of a man in charge of a news department of a newspaper has apparently not been considered by an appellate court, but has received considerable attention from the National Labor Relations Board itself. In The Sun Papers, 81 N.L.R.B. 82 (1949), assistant city editors and assistant sports editors who had "considerable authority for the direction of their department" were classified as supervisors. In The Daily Review, 111 N.L.R.B. 763 (1955), it appeared that the city editor was in charge of three reporters. He had authority to assign regular and special news stories to them, as he saw fit. He edited the stories written by his reporters, and discussed the quality of their work with them, making suggestions for improvement where necessary. He also engaged in general reportorial work as time permitted. The Board held:

"We find that the record in this case clearly establishes that Grimm responsibly directs the work of the reporters under him and that such responsible direction requires the use of independent judgment. Ac-

1. Section 2(3) of the Act defines an employee as follows:
   "(3) The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individu-

al employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined." 29 U.S.C.A. § 152(3).

2. Section 2(11) of the Act provides as follows:
   "(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

cordingly, we will exclude him from the unit as a supervisor."

More recently, in The Dallas Times Herald, 126 N.L.R.B. No. 68 (1960), city, women's, sports, business and amusement editors who were in charge of the form and content of work emanating from their respective desks were held to be supervisors because of their responsible direction of the work of the employee reporter assigned to their respective desks. Thus, the circumstances of an editor being independently responsible for the output of his department, with authority to determine and control just what that output will be, has consistently been held sufficient to classify that editor as a supervisor exercising "responsible direction" over his department.

In other circumstances, however, where it appeared that the department editor merely gave out reportorial assignments without any independent responsibility for them, and had little or no authority to follow through on the work of his subordinate reporters, the Board has held that such editors were not supervisors, but were nothing more than leadmen. Thus, in Greensboro News Company, Inc., 58 N.L.R.B. 54 (1949), supervisory status was denied an assistant sports editor because there was no showing that he could responsibly direct or discipline his single assistant. Likewise, city editors in The Daily Press, Inc., 110 N.L.R.B. 573 (1954), were denied supervisory status because they had no authority to discipline employees, to make effective recommendations regarding them, or even to make assignments to them. This latter is most significant —the editors could transmit assignments to the reporters at the managing editor's request, but they lacked authority to make assignments to reporters on their own initiative. In effect, they were no more than leadmen. Finally, in The Peoria Journal Star, Inc., 117 N.L.R.B. 708 (1957), a photographic editor was denied supervisory status because he testified "that he ha[d] nothing to do with the quality of the pictures or the per-

formance of the photographers." Also, in that case, an assistant sports editor was denied supervisory status because work assignments were delegated not by the editor, but by mutual consent of all reporters. Hence, the Board has taken the position that if an editor's sole discretion is to make or relay assignments, and he is not held responsible for the quality of the output of his department, then such editor exercises routine direction rather than responsible direction over his reporters, and he is not a supervisor.

■ We think that the overall position of the Board is in accord with the meaning of the term "responsible direction" as it has been interpreted in court decisions. The scope and extent of the meaning of such language was perhaps best considered in Ohio Power Company v. N. L. R. B., supra, at page 387. In that case the court analyzed the statute's meaning in the following language: "To be responsible is to be answerable for the discharge of a duty or obligation. Responsibility includes judgment, skill, ability, capacity, and integrity, and is implied by power." In our view, if a newspaper editor is given power or authority to direct or assign his reporter subordinates in the performance of their reportorial duties, and in turn is held answerable for the performance of his reporters in the extent and scope of coverage of news that he puts in his section of the paper, such direction is responsible direction and the editor is a supervisor. On the other hand, whenever the direction exercised has merely been that of relaying general orders to specific individuals, courts have held that the activity involved has not been sufficient to constitute responsible direction. Thus, in Precision Fabricators v. N. L. R. B., 2 Cir., 1953, 204 F.2d 567, the court, after indicating that the question turned on what powers the alleged supervisor was authorized to exercise, held that a leadman who assigned work to other employees after such assignments had been given to him was not a super-

visor because the direction that he exercised over his fellow employees was merely routine. See also N. L. R. B. v. Whitin Machine Works, 1 Cir., 1953, 204 F.2d 883, where an accountant who merely relayed orders from his supervisors was held not to be a supervisor over two clerks. In such cases, the delegation of assignments is one not involving or requiring the use of independent judgment, and such delegators are merely leadmen. In our view, if the editors are nothing more than leadmen, making assignments solely or primarily because of their seniority, and not held fully accountable for their department's performance as to the choice of news coverage effected by that department, such direction is not responsible direction and such editors are not supervisors.

In the case at bar, it is clear that Fuller was given full power and authority over the work and assignments of the reporters in his department. It was he who planned the work schedules of the reporters, and it was he who determined what county news to use in that section of the paper. It was not disputed that the managing editor did not edit the county news section of the newspaper, for such responsibility was solely that of Fuller.

Moreover, the record is clear that Fuller was held fully accountable and responsible for the performance and work product of the reporters in his department. He had an obligation to teach them what to do in their reporting, and to correct their faults or discipline them when they were delinquent. We think that the record, considered as a whole, points indisputably to the conclusion that Fuller was directly responsible for the performance of the county news department, and that he had power commensurate with his responsibility.

Fuller was not a leadman, doling out assignments which had already been given to him by the Managing Editor Johnson. Rather, he was required to exercise independent judgment in determining the output of his department. The record, considered as a whole, indicates that his direction of his reporters was not merely routine direction, but partook of the nature of responsible direction. Therefore, we feel that the Board clearly erred in failing to determine that County Editor Fuller was a "supervisor" within the meaning of that term as it is used in the National Labor Relations Act, and as it has been interpreted by the courts.[3]

It is no help to the petitioner to urge that Fuller spent at least half of his time as a reporter, and only half of his time as a supervisor, for it is the existence of supervisory power, and not necessarily the constant and continuous utilization of it, which determines whether a man is a supervisor. Ohio Power Company v. N. L. R. B., supra; N. L. R. B. v. Leland-Gifford Co., 1 Cir., 1952, 200 F.2d 620. See also Morrison v. Shopmen's Local Union 682, etc., D.C.W.D.Ky.1953, 114 F.Supp. 54, where the court held that an admitted supervisor did not lose his supervisory status because he engaged in ordinary productive work at such times as his supervisory duties would permit. Hence the fact that Fuller spent only half his time acting as a supervisor over his reporters is unavailing to destroy his status as a supervisor of the respondent.

3. The petitioner argues that if Fuller is denominated a supervisor, then others in respondent's news department with the title of editor (e.g. the telegraph editor, etc.) must be similarly denominated; and that such a result would create a supervisor-employee ratio of almost 1:1. The trouble with this argument, however, is that it would determine supervisory status solely from the title of the employee. It is clear, however, that supervisory status is determined by the powers and duties of an employee, and not by his title. N. L. R. B. v. Southern Bleachery & Print Works, 4 Cir., 1958, 257 F.2d 235, certiorari denied 1959, 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575. Therefore, it by no means follows that all the other news editors of respondent are supervisors just because Editor Fuller is a supervisor.

The law is clear that a supervisor is not entitled to the protection afforded ordinary employees under the National Labor Relations Act, and as to supervisors there can be no such thing as a discriminatory discharge or an unfair labor practice. L. A. Young Spring & Wire Corp. v. N. L. R. B., 1947, 82 U.S.App.D.C. 327, 163 F.2d 905 certiorari denied 1948, 333 U.S. 837, 68 S.Ct. 607, 92 L.Ed. 1121; N. L. R. B. v. Esquire, Inc., 7 Cir., 1955, 222 F.2d 253; Carpenters District Council, etc. v. N. L. R. B., 1959, 107 U.S.App.D.C. 55, 274 F.2d 564. Hence, respondent's discharge of Fuller was not an unfair labor practice, and the Board was without jurisdiction to order him reinstated with back pay allowances.

■■■■■■ It is true, of course, as petitioner argues, that the conduct of questioning employees concerning their union affiliations, in association with the firing of other employees because of their union membership, has been held to be coercive and an unfair labor practice to the questioned employees. N. L. R. B. v. Chautauqua Hardware Corp., 2 Cir., 1951, 192 F.2d 492. Since Fuller was a supervisor, however, as we have noted above, his discharge cannot form the basis of an unfair labor practice. Therefore, the case of the unfair labor practice as to the remaining employees of respondent must be rested merely on the questioning of such other employees. But it is well settled that the mere questioning of employees, standing alone, is not an unfair labor practice. N. L. R. B. v. McCatron, 9 Cir., 1954, 216 F.2d 212, certiorari denied, 1955, 348 U.S. 943, 75 S.Ct. 365, 99 L.Ed. 738. Hence, the conduct of questioning the employees, even though the supervisor Fuller was subsequently discharged, was not an unfair labor practice, and the Board was without jurisdiction to order respondent to cease and desist from such practice.

Accordingly, since Fuller was a supervisor, the board was without jurisdiction in this case, and the petition for enforcement of its order must be denied.