**SERVETTE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 17678.**

United States Court of Appeals
Ninth Circuit.

Nov. 26, 1962.

Motion for Clarification Denied
Jan. 22, 1963.

See 313 F.2d 66.

**660**

Hill, Farrer & Burrill, Carl M. Gould, Stanley E. Tobin and Barry R. Weiss, Los Angeles, Cal., for petitioner.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Lee M. Modjeska, and Norton Come, Attys., N.L.R.B., Washington, D. C., for respondent.

Before CHAMBERS and JERTBERG, Circuit Judges, and CLARK, District Judge.

JERTBERG, Circuit Judge.

This case is before the court upon the petition of Servette, Inc. to review a decision and order of the National Labor Relations Board dismissing an unfair labor practice complaint which had issued upon charges filed by petitioner. The Board's decision is reported at 133 NLRB p. 1501 (Oct. 30, 1961).

The case involves an attempt by the Wholesale Delivery Drivers and Sales-

men's Union, Local No. 848, to force several retail markets to cease doing business with petitioner with whom the Union was having a labor dispute. It was charged that the Union activity was proscribed by § 8(b)(4)(i)(ii)(B) of the National Labor Relations Act, as amended 29 U.S.C. § 158(b)(4)(i)(ii)(B).[1]

The primary facts are not in dispute. Petitioner is a wholesale distributor of specialty merchandise such as candy, liquor, holiday supplies and specialty articles in the area of Los Angeles, California. Included in such merchandise are brand name products, i. e., GOOD SEASON SALAD DRESSING and OLD LONDON PRODUCTS. Kory's Markets, Inc., McDaniels Markets and Daylight Markets (herein referred to as Kory, McDaniels and Daylight) separately operate chain retail food supermarkets in the area of Los Angeles, California. All of such markets regularly and customarily purchase, handle, stock and sell products distributed by petitioner.

In early February, 1960, as a result of a labor dispute with petitioner, the above named Union engaged in a strike against petitioner and picketed petitioner's warehouse located in Los Angeles. From February 3rd through March 10th, 1960, the Union, in aid and support of its strike

---

1. The relevant provisions of the National Labor Relations Act, as amended, are as follows:

"Sec. 8(b). It shall be an unfair labor practice for a labor organization or its agents * * *

* * * * *

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * *

"(B) forcing or requiring any person to cease using, selling, handling, transport-

ing, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person,

* * * * *

"Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution."

against petitioner, engaged in a campaign to enlist the aid and cooperation of Kory, McDaniels and Daylight to cease doing business with petitioner.

In its efforts to win the labor dispute with petitioner, agents of the Union engaged in the following conduct and practices:

1. Told the manager of McDaniels Market No. 14 that the Union had a labor dispute with petitioner. Asked him to cooperate by not dealing with petitioner and by taking petitioner's merchandise off his shelves. Told him that if he failed to cooperate they would pass out handbills to customers. Handbills were passed out but the manager continued his purchases from petitioner. The handbills passed out at this market, as well as at other markets herein mentioned, read as follows:

"To THE PATRONS OF THIS STORE"

"WHOLESALE DELIVERY DRIVERS & SALESMEN'S LOCAL NO. 848 urgently requests that you do not buy the following products distributed by SERVETTE, INC.:

"* BRACH'S CANDY
* SERVETTE CANDY
* GOOD SEASON SALAD DRESSING
* OLD LONDON PRODUCTS

"The SERVETTE COMPANY which distributes these products refuses to negotiate with the Union that represents its drivers. The Company is attempting to force the drivers to sign individual 'Yellow Dog' contracts. These contracts will destroy the wages and working conditions that the drivers now enjoy, and will set them back 20 years in their struggle for decent wages and working conditions.

"The drivers of Servette appreciate your cooperation in this fight."

2. Asked the manager of McDaniels Market No. 18 to remove merchandise distributed by petitioner from his shelves. At a meeting of the store managers of McDaniels, the managers were told by higher officials to use their best judgment in the matter and to do as they thought wise. The manager of McDaniels Market No. 18 either reduced his purchases from or ceased doing business with petitioner.

3. Requested the manager of McDaniels Market No. 25 not to handle petitioner's merchandise. He was shown a copy of the handbill. The manager of McDaniels Market No. 25 either diminished or terminated his business with petitioner.

4. Requested the manager of Daylight Market No. 3 to cooperate with them in their dispute with petitioner by not handling petitioner's products, and told him they were passing out handbills to the customers of those markets which refused to cooperate.

5. Told the manager of Kory's Market No. 6 of the dispute with petitioner, showed a copy of the handbill to him, and told him that the handbills would be passed out to his customers unless Kory ceased doing business with petitioner. When the manager told them he would have to check with the main office, handbills were passed out to customers. The next week the manager refused to allow petitioner to stock his shelves. On two subsequent occasions, agents visited this market to ascertain whether or not petitioner's merchandise was on display.

6. Passed out handbills at Kory's Market No. 5.

7. Asked the manager of Kory's Market No. 1 if he would cooperate by removing petitioner's products from his shelves. The manager said he would have to ask advice from his supervisor. Handbilling occurred at this market on two different occasions.

8. Passed out handbills to the customers of Kory's Market No. 2 and told the manager that they would stop handbilling if he would cease handling petitioner's products.

9. Passed out handbills to customers of Kory's Market No. 3.

Handbilling occurred at certain of the markets above mentioned which purchased GOOD SEASON SALAD DRESSING and OLD LONDON PRODUCTS not from petitioner but from Certified Grocers of Southern California, another distributor not involved in the labor dispute existing between petitioner and the Union.

The Board, with one member dissenting, concluded that the conduct and practices of the Union did not constitute a violation of § 8(b)(4)(i)(B) and that the handbilling of the various markets doing business with the petitioner was protected by the publicity proviso to § 8(b)(4).

In its decision and order, the Board stated, in part, as follows:

"We agree with the Trial Examiner's conclusion that the appeal to the various store managers doing business with Servette did not constitute a violation of Section 8(b)(4)(i)(B), since the record establishes that the store managers whom the respondent sought to persuade not to do business with Servette were not 'individuals' as that term is used in Section 8(b)(4)(i)(B). We do so, however, only for the reasons set forth in the Carolina Lumber Company[2] and Minneapolis House Furnishing Company[3] cases. * * *

"We also agree, on the basis of our recent Lohman Sales Company decision,[4] that the Respondent's handbilling of the various stores doing business with Servette was protected by the publicity proviso to Section 8(b)(4)."

The dissenting member stated, in part, as follows:

"As I pointed out in my dissenting opinion in Lohman Sales, 132 NLRB No. 67, the proviso to Section 8(b)(4) does not protect handbilling of secondary employers in furtherance of a dispute with a distributor; the proviso contemplates, at most, the protection of handbilling of a secondary distributor in furtherance of a dispute with a primary employer who produces a product. And the bare and simple fact is that Servette does not produce any products.

"Accordingly, I would find the Respondent's threats to handbill, and its subsequent handbilling activities, constitute violations of Section 8(b)(4)(ii)(B) of the Act."

The position of the Board, as stated in its reply brief, appears in the following language:

"In the Board's view, the Union's appeals to the various retail store managers did not constitute a violation of Section 8(b)(4)(i)(B) because, although the forbidden object existed, the means for attaining that object which the Section proscribes was lacking. That is, the only persons induced were the store managers who cannot be regarded as 'any individual employed by any person' within the meaning of Section 8(b)(4)(i)(B). Rather, the store managers must be considered as 'any person' under Section 8(b)(4)(ii), and, as such, entitled to protection against the type of conduct or means specifically proscribed therein, namely, threats, coercion, or restraint."

Admittedly, each of the store managers is an individual and each is employed by a person engaged in commerce. It is the petitioner's contention that the clear wording of the phrase "any individual employed by any person" leaves no room for any construction that would exclude "supervisors" from the category de-

2. Local 505, International Brotherhood of Teamsters, et al. (Carolina Lumber Company), 130 NLRB p. 1438 (Mar. 17, 1961).

3. Upholsterers Frame & Bedding Workers Twin City Local No. 61, etc. (Minneapolis House Furnishing Company), 132 NLRB p. 40 (July 11, 1961).

4. International Brotherhood of Teamsters, etc. Local 537 and Jack M. Lohman, 132 NLRB p. 901 (Aug. 10, 1961).

scribed in the phrase. Petitioner also asserts that Congressional history fortifies petitioner's contention that Congressional intent in the choice of the language employed in the phrase was to make it an unfair labor practice for a union to induce or encourage "supervisors" where an object is to force or require any employer "to cease doing business with any other person."

The issue thus created arises under the amendments made to § 8(b)(4)(A) (P.L. 86–257, 73 Stat. 519, approved Sept. 14, 1959). For the amended law, see Footnote 1, supra.

Section 8(b)(4)(A) provided:

"It shall be an unfair labor practice for a labor organization or its agents—

"(4) to engage in, or to induce or encourage the *employees of any employer* to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is:

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person."

(Emphasis supplied)

In its Carolina Lumber Company case, supra, upon which the Board rested its decision in the instant case, the above Section was held by the Board not to be applicable to inducement of supervisors [5] because they were not employees within the meaning of the Act,[6] and, further, that Section was held not to apply to the inducement of farm, railway, or public employees for the same reason.[7] It is to be noted (see Footnote 1, supra) that § 8(b)(4)(i)(B) substitutes the phrase "any individual employed by any person" for the phrase "employees of any employer" as used in § 8(b)(4)(A).

The Board recognized in its decision in the Carolina Lumber Company case, supra, "[t]hat the new law bars inducement of a broader category of employed persons tha[n] the old * * *" but concluded from legislative history that "'any individual employed by any person' in 8(b)(4)(i) refers to supervisors who in interest are more nearly related to 'rank-and-file employees' than to 'management,' as the term is generally understood. On the other hand, the term 'person' as used in 8(b)(4)(ii) would seem to refer to individuals more nearly related to the management level. So construed, 8(b)(4)(i) would outlaw attempts to induce or encourage employees and some supervisors, to achieve the objectives proscribed by 8(b)(4). Similar attempts to induce or encourage others more nearly related to the managerial level for the same objectives would be lawful. However, if in the latter case the labor organization went beyond persuasion and attempted to coerce such managerial officials to accomplish the pro-

---

5. Title 29 U.S.C. § 152(11), provides:
    "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

6. Title 29 U.S.C. § 152(3), in pertinent part, provides:
    "The term 'employee' * * * shall not include * * *, or any individual employed as a supervisor, * * *."

7. Sheet Metal Workers International Association, Local Union No. 28, (Ferro Co. Corporation), 102 NLRB 1660 (supervisors); W. T. Smith Lumber Company, 116 NLRB 1756, reversed 246 F.2d 129 (C.A.5) (railroad employees); Paper Makers Importing Co., Inc., et al., 116 NLRB 267 (municipal employees).

scribed objectives, it would violate 8(b)(4)(ii)."

While the Board concedes that the substituted phrase "any individual employed by any person" for the phrase "employees of any employer," shows on its face a Congressional intent to broaden the category of employed persons and that the literal meaning of the language employed by Congress is broad enough to include "supervisors" in the category described in the Section as "any individual employed by any person," it urges, nevertheless, that to give the phrase the construction urged upon us by the petitioner would be contrary to the purpose of the Act, contrary to Congressional intent, and would render § 8(b)(4)(ii) (B) of the Act meaningless and futile.

■ Before giving further consideration to the problem before us, we note that the definition of "supervisor" in the Act (see Footnote 5, supra) is broad. It means

"* * * any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

It has long been settled by court decisions that an employee must be classified as a supervisor if he exercises any one of the powers set forth in § 2(11) of the Act. National Labor Relations Bd. v. Edward G. Budd Mfg. Co., 169 F.2d 571 (6th Cir. 1948), cert. denied 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441; Ohio Power Co. v. N.L.R.B., 176 F.2d 385 (6th Cir. 1949), cert. denied 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553; N.L.R.B. v. Fullerton Publishing Company, 283 F.2d 545 (9th Cir. 1960); N.L.R.B. v. Southern Airways Company, 290 F.2d 519 (5th Cir. 1961). Supervisory status is determined by the powers and duties of an employee, and not by his title. National Lab. Rel. Bd. v. Southern Bleachery & Pr. Wks., 257 F.2d 235 (4th Cir. 1958), cert. denied 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575.

The court decisions are in accord with legislative history, as noted in N.L.R.B. v. Southern Airways Company, supra, 290 F.2d at p. 523:

"The legislative history of § 2(11) is helpful in this regard. The Senate Report envisaged a 'supervisor' under the Act as being an employee 'vested with such general management prerogatives as the right to hire or fire, discipline, or make effective recommendations with respect to such action. * * *' Sen. Rep. 105, 80th Cong.; 1 Leg.His. of the L.M.R.A. p. 410; Poultry Enterprises, Inc. v. N.L.R.B., 5 Cir., 1954, 216 F.2d 798, 801. As expressed on the floor of the Senate, to come within this category the individual should 'direct responsibly' the action of employees under him. 2 Leg.His. of the L.M.R.A., p. 1303; N.L.R.B. v. Swift & Co., 9 Cir., 1957, 240 F. 2d 65, 66 note 1. The Conference Report on the Bill later enacted into § 2(11) shows that the definition was intended to cover persons 'generally regarded as foremen and persons of like or higher rank.' 1947 U.S. Code Cong. & Admin. News, pp. 1135, 1141."

It is clear to us that under the old Section insofar as relevant to the problem before us, "employees of an employer" embraced all employees except supervisors as defined in the Act and that there existed but one category of employees who were excluded from the term "employees" and that category was by law defined as "supervisors."

It must be assumed that members of Congress were aware of the definitions contained in the Act and the unanimity of court decisions construing the same.

■ Since a supervisor is an individual employed by an employer and since by the provisions of the Act (see Foot-

note 6, supra) the term "employee" does not include any individual employed as a supervisor, it appears clear that when Congress amended the phrase "the employees of any employer" to read "any individual employed by any person," Congress intended by the plain, unambiguous language used to include supervisors in the category described in the amendment as "any individual employed by any person."

Under the view that the plain meaning of the language used by Congress was at variance with the purpose of the Act and the intent of Congress, the Board resorted to legislative history and concluded that:

"  'any individual employed by any person' in 8(b)(4)(i) refers to *supervisors who in interest are more nearly related to 'rank-and-file employees' than to 'management,'* as the term is generally understood. On the other hand, the term 'person' as used in 8(b)(4)(ii) would seem *to refer to individuals more nearly related to the management level.* So construed 8(b)(4)(i) would outlaw attempts to induce or encourage *employees and some supervisors,* to achieve the objectives proscribed by 8(b)(4). Similar attempts to induce or encourage *others more nearly related to the managerial level* for the same objectives would be lawful. \* \* \*"

(Emphasis ours.)

By such construction, the Board creates two categories of "supervisors" contrary to the definition of the term "supervisor" as used in the Act and contrary to court decisions. In one category are supervisors related to rank-and-file employees, and in the other category are supervisors more related to management. The Board's construction also requires that the phrase "any person engaged in commerce," appearing in § 8(b)(4)(i), shall be given a different meaning than the same phrase appearing in § 8(b)(4)(ii). The Board's construction would place labor organizations in an untenable and precarious position. Such construction in many instances would force labor organizations to run the risk of committing unfair labor practices without knowing which "supervisors" of an employer they could or could not lawfully induce or encourage and which "supervisors" are or are not persons engaged in commerce under § 8(b)(4)(ii).

The Board also contends that if the plain meaning of the language used in the new law be followed, § 8(b)(4)(ii) would be rendered meaningless and futile because the word "induce" appearing in § 8(b)(4)(i) has the same meaning as the word "threaten" appearing in § 8(b)(4)(ii). Our research leads us to the conclusion that the two words have separate and distinct meanings.

The Board contends that the plain meaning of § 8(b)(4)(i) is at variance with the purpose of the National Labor Relations Act and contrary to the intent of Congress.

The Supreme Court, in United States v. Amer. Trucking Ass'ns, 310 U.S. 534, at pp. 543–544, 60 S.Ct. 1059, at pp. 1063, 1064, 84 L.Ed. 1345, stated:

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use,

however clear the words may appear on 'superficial examination.' "

(Footnotes omitted.)

If under the above quoted decision, resort may properly be made to legislative history, we find therein no basis for the Board's contentions.

■ The basic purpose of the National Labor Relations Act is to promote industrial peace through collective bargaining and an orderly settlement of disputes.

The evil which Congress sought to correct, as stated by Representative Griffin, is as follows:

"Present law provides that it is unlawful for a union to induce or encourage 'employees of any employer' to engage in a strike or 'concerted refusal' to do their work for one of the forbidden objects listed in Section 8(b)(4)—such as to force their Employer to cease doing business with a 'primary employer.' Since farm laborers, railway labor and supervisors are not 'employees' within the meaning of the Act, unions may now, without penalty, induce them to engage in secondary boycotts. This bill corrects this by changing the word 'employees' in the phrase quoted above to 'any individual employed by any person.' This change appears in clause 4(i)." (Legislative History of the Labor Management and Disclosure Act of 1959, Vol. II, pp. 1520–1523 (G.P.O. 1959)).

In explaining this change, then Senator Kennedy and Representative Thompson, his conference associate, submitted an analysis of the differences between the House and Senate bills before the Conference Committee (105 Cong.Rec. 16589; II Leg.Hist. 1706–1707) with the following comment:

"In some industries supervisors belong to the union of the rank-and-file workers or as ex-members are sympathetic to it. Occasionally a union has induced the supervisors of a secondary employer to refuse to handle the goods of some primary employer with whom the union had a dispute. This conduct causes a true secondary boycott but it does not violate section 8(b)(4)(A) because section 8(b)(4)(A) forbids only the inducement of 'employees' and supervisors are not 'employees' within the statutory definition.

\* \* \* \* \* \*

"The House bill would extend the prohibition to inducement of supervisors. The present omission is an illogical loophole which should be closed if any legislation dealing with secondary boycotts is enacted. The substance of the House bill is therefore acceptable upon this issue."

Senator Morse, one of the conferees on the part of the Senate, who spoke in favor of the conference bill's provision, stated (105 Cong.Rec. 17882; II Leg.Hist. 1426):

"There are many instances also where a secondary boycott is conducted by a union agent going to a supervisor of employees, who often is a union member, and inducing him to shut off deliveries. Since the supervisor is subject to union discipline, such inducement would be clearly as effective as though inducement were applied to employees, themselves."

Senator Humphrey stated, as follows:

"[T]he amendment proposed by the Senator from Arizona [Mr. Goldwater] would change the words 'employees of any employer' to 'any individual employed by any person', and would delete the word 'concerted' \* \* \*

"As it now stands, section 8(b)(4) does not prohibit appeals or requests directed to supervisory or managerial employees because these individuals are not employees within the statutory definition. But they are surely individuals; and to substitute the word 'individual' for the word 'employees' would place requests and appeals to them within the prohibition of the law." Re-

marks of Senator Humphrey on the Goldwater amendment, 105 Daily Cong.Rec. 5580, April 17, 1959, II Leg.Hist. 1037.

In the Senate Committee analysis of this change, it is stated:

"The present law bans the inducement of employees of a scondary employer when the object thereof is to cease doing business with another employer. The revision includes the following features * * *. (2) Inducement of a single employee or a supervisor employed by a secondary employer is banned. * * *." Senate Committee Analysis, Committee print, Subcommittee on Labor of the Committee on Labor and Public Welfare, United States Senate, 86th Congress, First Session, Sept. 10, 1959, I Leg.Hist. 965.

We do not agree that the plain wording of the new amendment is at variance with the purpose of the Act or the intent of Congress.

Our attention has been called to the fact that the Second Circuit in N.L.R.B. v. Local 294, Internat'l Bro. of Teamsters etc., 298 F.2d 105 (2d Cir. 1961), has reached a different result from that reached in this opinion. We have reviewed such opinion but are not persuaded. Rather, we are persuaded by the following quotation from Crooks v. Harrelson, 282 U.S. 55 (1930), at p. 60, 51 S. Ct. 49, at p. 50 where the Court stated:

"Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for

great caution and circumspection in order to avoid usurpation of the latter. Monson v. Chester, 22 Pick. [Mass.] 385, 387. It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with law making authority, and not with the courts. See In re Alma Spinning Company, L. R. 16 Ch.Div. 681, 686; King v. Commissioners, 5 A. & E. 804, 816; Abley v. Dale, L.J. (1851) N.S. Pt. 2, Vol. 20, 233, 235. And see generally Chung Fook v. White, 264 U.S. 443, 445 [44 S.Ct. 361, 68 L.Ed. 781]; Commr. of Immigration v. Gottlieb, 265 U.S. 310, 313 [44 S.Ct. 528, 68 L.Ed. 1031]."

■ We disagree with the Board's conclusion that the handbilling of the various markets doing business with the petitioner was protected by the publicity proviso to § 8(b) (4). The proviso does not protect threats to handbill and handbilling of secondary employers in furtherance of a dispute with a distributor. Petitioner is a distributor and does not produce any products. The effect of the proviso in the case of a distributor is fully discussed in the opinion of this Court in Great Western Broadcasting Corporation v. N. L. R. B., 310 F.2d 591. We deem it unnecessary to repeat here what is stated in that opinion.

The Board erred in dismissing the unfair labor practice complaint. The Board's decision, findings and order are and each of them is set aside. The cause is remanded to the Board for further proceedings consistent with the views expressed herein.