**WEST PENN POWER COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD.**
No. 14555.

United States Court of Appeals
Third Circuit.

Argued Feb. 3, 1964.

Decided Nov. 3, 1964.

Donald B. Heard, Reed, Smith, Shaw & McClay, Pittsburgh, Pa. (Nicholas Unkovic, James Q. Harty, Pittsburgh, Pa., Charles L. McCormick, Greensburg, Pa., on the brief), for petitioner.

Allen M. Hutter, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Lee M. Modjeska,

Attorney, N. L. R. B., on the brief), for respondent.

Before McLAUGHLIN, GANEY and SMITH, Circuit Judges.

GANEY, Circuit Judge.

This is a petition for review and setting aside of two orders issued by the National Labor Relations Board. The order, dated August 12, 1963, in Case No. 6–CA–2644, directed the West Penn Power Company to cease and desist from refusing to bargain with the Utility Workers Union of America, System Local No. 102, AFL–CIO, concerning wages, hours and working conditions of the Company's employees classified as Transmission and Distribution Supervisors.

The above order was based upon a determination by the Board on November 7, 1962, in Case No. 6–RC–846, as the result of a motion for clarification and/or amendment of the certification filed by the Company on February 6, 1962, wherein the Board held that the Transmission and Distribution Supervisors were employees within the meaning of the definition of "employee", as set out in § 2(3) of the Labor Management Relations Act, 29 U.S.C.A. § 152 (3),[1] and were not supervisors within the meaning of § 2(11) of that Act, 29 U.S. C.A. § 152(11).[2]

The court has jurisdiction here since the alleged unfair labor practices occurred in Springdale and Charleroi, Pennsylvania, within this judicial circuit.

The West Penn Power Company will hereinafter be referred to as the "Company", the Utility Workers Union of America will be referred to as the "Union" and the Transmission and Distribution Supervisors will be referred to as the "T & D Supervisors."

The Company is a public utility distributing and selling electrical energy in 18 counties in western and north central Pennsylvania for residential, commercial and industrial purposes and is engaged in interstate commerce within the meaning of the Labor Management Relations Act, as amended. It serves approximately 390,000 customers and since 1930, the number of these has more than doubled and the number of employees has steadily increased. There are presently five steam generating plants and one hydro station operated by the Company.

In 1944, the Board, after hearing, certified the Union as the bargaining representative "of all load dispatchers of West Penn Power Company, in the Springdale Power Station, and the Charleroi Substation, Pittsburgh, Pennsylvania, excluding all supervisory employees * * *, as their representative for the purposes of collective bargaining, * *."

In 1946, the Dispatchers as a group withdrew from the Union, but in 1951, as the result of a consent election, the

1. This sub-section reads as follows:
"(3) The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined."

2. This sub-section reads as follows:
"(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

Company again recognized the Union as the collective bargaining representative of "all load dispatchers of the West Penn Power Company who are located in the Springdale, Pennsylvania Power Station and Charleroi, Pennsylvania Dispatching Center: EXCLUDING ALL other employees and guards, professional employees and supervisors, as defined in the National Labor Relations Act, as amended."

The labor agreement entered into and between the Company and the Union included all "Load Dispatchers" among the groups for recognition. These included the first and second load dispatchers in Charleroi and the load dispatchers in Springdale, before September 1, 1960. The load dispatchers at Springdale and the second load dispatchers at Charleroi were responsible for transmission and distribution of power from the generating stations to the substations. The substations broke down the power to lower voltages for distribution to the Company's customers. On September 1, 1960, a program of decentralization was entered into by the Company and three new operating centers were opened at Arnold and Connellsville, Pennsylvania, and the previous job classification of operating instructors, who were not included in the collective bargaining unit, the Charleroi second load dispatchers, and Springdale load dispatchers, were eliminated. Earlier, in a management bulletin issued on March 31, 1960, telling of the coming change on September 1, 1960, it stated that because of the dispatchers' knowledge of operating practices, it was expected that with training in management functions and supervisory skills, most of the present load dispatchers would qualify for the new positions of Transmission and Distribution Supervisors. The Charleroi first load dispatchers were to be re-classified as power dispatchers, but with little change in their duties and responsibilities.

Under the provisions of the above mentioned agreement, entered into between the Company and the Union for the years 1956–1961, the Union filed a grievance petition, dated September 15, 1960, wherein they protested the Company's refusal to bargain on behalf of the T & D Supervisors, as the Company held that the positions of the T & D Supervisors, newly created, placed them in the supervisory or management class and were not included in the collective bargaining unit. On November 17, 1960, the Union filed unfair labor practices against the Company for refusal to bargain with it on behalf of the T & D Supervisors, but the Acting Regional Director refused to issue a complaint, which action was sustained by the General Counsel of the National Labor Relations Board.

The Union continued to insist that it should be the collective bargaining agent for the T & D Supervisors and, as a result, the Company, on February 6, 1962, filed the motion for clarification and/or amendment of the certification of the Board on June 20, 1951, as heretofore adverted to.

Once again, the Union filed unfair labor practice charges against West Penn Power Company on December 10, 1962, because the Company refused to bargain with it on behalf of the T & D Supervisors. After a hearing was held on these charges, the Board, in its decision and order, adopted, with a modification, the Trial Examiner's report that the Company had refused to bargain with the Union on December 5, 1962, regarding the new unit designated. The modification was that the unit was to include those T & D Supervisors at the two additional dispatching centers established in 1960, to wit, Connellsville & Arnold. From this order of the Board, the Company has filed this petition for review.

It is requisite that in order to resolve the issue here posed, the Congressional intent as to the meaning of the terms "employee" and "supervisor" is to be analyzed and the courts' interpretation thereof carefully scrutinized since the factual data in each decided case before the Board and the appellate courts will

be different and, of necessity, the meaning of the terms "employee" and "supervisor" has been subject to a great deal of litigation.

However, it is unnecessary here to definitively circumscribe the orbit of the terms "employee" or "supervisors" as it is apparent Congress fully appreciated that such relationships could not be placed in separate categories or that technical concepts of the terms should be controlling, but that there should be taken into consideration the broad intendment of the Act. As its first section sets out, it is designed to eliminate "substantial obstructions to the free flow of commerce" resulting from "strikes and other forms of industrial strife or unrest."

It is in this context that we proceed to determine whether, under the factual situation here presented, the rule in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, has been complied with and whether, on the record as a whole, there is substantial evidence to support the Board's findings. Accordingly, examining the record as a whole, the conclusion is reached that this court "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., supra, at 488, 71 S.Ct. at 465.

■ ■ It has been settled by many court decisions, an employee must be defined as a supervisor if he exercises any one of the powers set forth in § 2(11) of the Act. Servette, Inc., v. N. L. R. B., 9 Cir., 310 F.2d 659, 664. This section does not require the powers described be exercised during any definite part of the employee's time. It is the existence of the power which determines the classification of whether an individual is an employee or a supervisor. Ohio Power Co. v. N. L. R. B., 6 Cir., 176 F.2d 385, at 388, 11 A.L.R.2d 243; N. L. R. B. v. Fullerton Publishing Co., 9 Cir., 283 F. 2d 545, at 548; N. L. R. B. v. Whitin

Machine Works, 1 Cir., 204 F.2d 883; N. L. R. B. v. Leland-Gifford Co., 1 Cir., 200 F.2d 620. It was said by this Court in N. L. R. B. v. Beaver Meadow Creamery, Inc., 3 Cir., 215 F.2d 247, though it affirmed the Board's action under the particular facts obtaining there that the individual was not a supervisor, that "We quite agree that Section 2(11) must be read disjunctively, that the possession of any one of the Section 2(11) powers will make one a supervisor, and that it is the fact of possession of the power regardless of its nonexercise that is determinative." (p. 251). While it is agreed that some cases point out that the mere responsibility of making work assignments in a routine fashion does not make an employee a supervisor, Precision Fabricators, Inc. v. N. L. R. B., 2 Cir., 204 F.2d 567, nor the mere fact that he spends a portion of his time instructing less experienced employees, N. L. R. B. v. Valentine Sugars, 5 Cir., 211 F.2d 317, nor that the assumption of some supervisory authority during a temporary period does not bring the employee within the definition, N. L. R. B. v. Stewart, 5 Cir., 207 F.2d 8; Poultry Enterprises, Inc. v. N. L. R. B., 5 Cir., 216 F.2d 798, nevertheless, these conditions do not present themselves here.

The duties of the T & D Supervisors, after September 1, 1960, went further since they were charged with the responsibility of directing and supervising the conduct of men and, in their nature, they were more related to managerial and company functions than to those of ordinary employees. This conclusion is reached if we use as a guide that approach taken in Local 636, etc., Plumbing & Pipe Fit. Ind. of the United States v. N. L. R. B., 109 U.S.App.D.C. 315, 287 F.2d 354, 362, wherein the court held, as some criteria, the following: "(1) The nature of the supervisory position; how completely the responsibilities of the particular position identify the holder of the position with management. Careful reference should be made to § 2(11), (Act of 1947) bearing in mind that the definition therein contained was not

intended to include 'straw bosses' and leadmen. Such consideration is necessary because of the infinite possible variations in responsibilities enumerated in § 2(11). (2) Apparent permanence of the supervisory position; * * *. (3) The extent to which his position is properly included in or excluded from the bargaining unit. * * *"

The Board, in finding that the duties required of the T & D Supervisors did not make them supervisors within the meaning of the Act, relied on N. L. R. B. v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170. It was primarily this decision which led to the 1947 amendment of the Act, N. L. R. B. v. A. S. Abell Co., 4 Cir., 327 F.2d 1, 4, and, accordingly, the case is no longer authoritative on the definition of an employee, although the main impact of the amendment was the distinguishing of an employee from an independent contractor.

In N. L. R. B. v. Quincy Steel Casting Co., 1 Cir., 200 F.2d 293, another case relied upon by the Board, the factual situation obtaining there is entirely different from that of the instant case, inasmuch as the employee was a molder the greater portion of his working time and there was evidence in the record that any skilled molder was competent to handle the job and that other workers engaged with him testified that the operation was more or less routine. In the case of the other employee, the record showed that he had no full-time employees working under him and, in answer to a question whether in supervising the core room where he was employed, he testified, "That's right, I am in full charge of myself." regarding himself only as one of the workers, rather than a supervisor.

Another case relied on, N. L. R. B. v. Leland Gifford Co., supra, gives the Board no support for its position, since, 200 F.2d at 625, it is held, "On the other hand, we think the statute does mean that once an individual has actually been clothed with genuine power to perform a supervisory function, he thereupon becomes a 'supervisor,' even before an opportunity arises to exercise his power, and even though he may not often find it necessary to exert the power conferred. That is to say, one clothed with real power to discipline other employees, for instance, would be *ipso facto* a 'supervisor,' even though in a particular instance months, or perhaps in rare cases even years, might pass before any occasion ever arose calling for an exercise of the power."

Another case relied upon by the board is N. L. R. B. v. Beaver Meadow Creamery, Inc., supra. There, the factual situation is, in no wise, comparable to that which obtains here for the reason that this case concerned itself with the discharge of an employee for attempting to organize a union to represent his fellow employees and the Board found that this was a discriminatory discharge in violation of § 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158(a) (1) (3). However, in discussing the finding of an unfair labor practice, the court, as we have already indicated, supra, 215 F.2d at 251, said that it is the fact of the possession of the power, as we have adverted to earlier, that is determinative of status.

However, the facts in the instant case show much greater authority and the requisite for independent judgment on the part of the T & D Supervisors than the previous position of either type of load dispatchers at either Charleroi or Springdale and, as we have indicated, the duties are more closely applied with management than with their fellow employees.

In the determination of whether or not the T & D Supervisors should be excluded from the bargaining unit, great weight must be attached to the job description of the T & D Supervisors, as set out by the Company, wherein they are required to determine action, assign and direct employees on approved call-out lists to maintain or restore industrial, commercial and residential customer service, as well as decide when

an employee's request for excuse from overtime assigned will be granted, and gives authority within the district after daylight hours, which will be pointed out hereafter. These duties, while not completely new, gave to them a much wider latitude of authority and responsibility in the direction of the Company's affairs than they ever possessed as second load dispatchers at Charleroi or load dispatchers at Springdale.

In the job description covering services required of the T & D Supervisors, since September 1, 1960, the duties required are:

(1) "Assign and direct the work of communications technicians." This is a new responsibility for the T & D Supervisors, in that this work previously had been done by the division operating superintendent. Additionally, they were to give instructions to company and customer employees in the operation of communications equipment which, likewise, was an additional duty not performed previously by the load dispatchers.

(2) "Recommend disciplinary action to be taken with employees engaged in switching and other related work when warranted and report operating errors and investigate as required. Participate in adjustment of Union first-level grievances or differences arising from work under his supervision." All of these new duties assigned to T & D Supervisors are new responsibilities, with the exception of reporting on operating errors, and are more managerial than routine.

(3) "Appraise employee work performance in assigned area of responsibility; determine eligibility for operating; and recommend changes in employee classification." All of these responsibilities are new and were not previously performed by the load dispatchers and are more managerial than routine.

(4) "Prepare and recommend material for instruction manuals. * * *" This was a new duty not performed by the former load dispatchers and is a function requiring the use of independent judgment.

(5) "Keep the Supervisor of Operations—Division informed on the status of division operating and supervisory control activities." This is a new responsibility imposed on the T & D Supervisors and was done previously by the supervisor of operations who was part of management.

(6) "Confer with district operating personnel to coordinate and arrange outages of lines, substations, and communications facilities; operating instructions; layout and changes of lines; names for switches, circuits, and substations. Assist district operating personnel in the investigation of customer operating problems, as required." These were all additional responsibilities imposed on the T & D Supervisors that they did not possess as load dispatchers, with the exception of the naming of switches, which the former load dispatchers had something to do with, though very little.

(7) "Consult with other supervisory control centers with respect to planned outages, information on load conditions, temperature, unsafe conditions, switching and interruptions to service; and keep them informed on changes in operating instructions." As load dispatchers, they exchanged weather data among various dispatchers, but this is the first time they had authority for this type of thing, especially with respect to planned outages.

(8) "Contact industrial and commercial customers to arrange service interruptions, train and examine customer employees in operating of switching equipment, direct required switching, and coordinate work progress." These were new responsibilities.

Additional duties which the new T & D Supervisors now possess, not permitted before, are that they may now make management decision on whether they can reconnect or disconnect a customer who is either delinquent or has a problem in respect to his electricity, so they now have complete authority in the customer relations' authority of the district, and at the close of the district office at five o'clock at night, the T & D Supervisors

are in complete charge of the entire district and work twenty-four hours a day, around the clock. As has been indicated, while the T & D Supervisors assume many of the jobs formerly done by the load dispatchers, there are many additional supervisory duties added to the new job, such as the taking over of the duties of operating instructors who were formerly never included within the bargaining unit which was certified. Furthermore, only a supervisor can rate an employee and this is of particular significance since it does affect the pay of all union employees.

When there is a prearranged or scheduled outage, which the T & D Supervisors are to follow and something else arises, it is the duty of the supervisors to determine whether or not the prearranged work should be performed or whether some other work should be done in its place, and they have the final authority for the lines and the operation and maintenance of them in their district and, if a supervisor feels that he wants to call off a line crew that is doing prearranged work, he may do so or he may refuse if he feels it is in the best interest of the Company and he has authority to do it without any further consultation.

Additionally, he has the authority to reconnect customers with service by using his own discretion and judgment without checking with anybody else. Further, they have the authority to hire and fire but, at the time of the hearing before the Board, very little time had elapsed for the exercise thereof.

With respect to vacations, the T & D Supervisors operate under the supervisory plan and can schedule their vacations whenever they want, as long as it meets with the wishes of their supervisor. The supervisory employees also enjoy a more liberal medical plan than the union employees and the major medical plan applies to supervisors and is not in effect for union people so that if a person were formerly a second load dispatcher, he would now have this plan when he became a T & D Supervisor.

Previous to their being appointed T & D Supervisors, they were called together and advised that they were supervisors and had certain duties and obligations to perform because, under the old set-up when most of them were second load dispatchers, the prearranged work would come in and they would make out the sheets, but they were not the final authority on them, as each sheet was checked by the chief load dispatcher who was the final authority, but, under the new arrangement, the T & D Supervisors have final authority.

Another additional responsibility of the T & D Supervisor is that he has the authority, without consulting anybody else, on his own, to determine whether or not a line can be de-energized on a particular day and for what particular period. Additionally, when a request is made for repairs or maintenance performed on equipment, the line foreman makes a request to the T & D Supervisor to take that piece of equipment out on a certain time and a definite day and he analyzes the request and he can either consent or not that it be done on a particular day and he is the final authority as to whether or not it is to come out of service and when.

As testified to by Paul Goberni, who had previously been an operating instructor and was now a T & D Supervisor —the job of operating instructor became absorbed in the T & D supervisor position—he must go out in the field and instruct in switching and in the grading of the men whom he instructs and as a result of his exercise of independent judgment, he can qualify an individual in rating him or disqualify him which would result in his failure to receive an increase in pay or go on to a higher classification.

In connection with communications technicians where, for instance, a radio was out of order, the T & D Supervisor calls a communications technician to repair the same and, while he is not acquainted with the complexities of the job to be performed, it would be up to him to see that the job was correctly

done. While he may not possess the technical knowledge of the communications technicians, this is true in many supervisory capacities where an executive is not possessed of the technical knowledge of those under his supervision.

One, George W. Wilson, a T & D Supervisor, when questioned on cross-examination as to the differences between the new job he was now performing and the duties he had to perform as load dispatcher at Springdale or first and second load dispatchers at Charleroi, he answered that the communications technicians reported to him directly every morning so that he knew what he was going to be doing and, in the case of trouble, he would assign them work. Further, that he had sole responsibility in his division of the distribution of power on all 25 to 132 KV lines, that he never had authority to call out linemen as a second load dispatcher, that he had to deal directly with the district operating superintendent. He also testified that previously, as a second load dispatcher, he could not take a customer off a single-feed line without getting permission from the district operating superintendent, and now under the new duties assigned to him, he could take a customer off a single-feed line without getting anybody else's permission. Further, that he had the authority to recommend individuals for promotion, such as an operating technician whom he recommended for promotion and who was promoted. He has the power now to recommend, with respect to lay-offs and discharges, although he could not discharge on the spot. Further, he plans the monthly work schedule for two communications technicians and after making them out, sends them out to them.

Paul Irvin, a T & D Supervisor, assigned to the New Kensington District, testified with respect to operating instructions which were part of his duties. He would set up a case of trouble and question the employee along that line and, if he felt he was qualified after he made his answers, he would either pass him or reject him. He likewise testified that he had the power to deviate from prearranged work plans for linemen and this was usually done wherever, in his judgment, a hazard might possibly be created. Further, as a T & D Supervisor, he trained linemen, servicemen and substation men which he did not do as a load dispatcher at Springdale; he participated in planning in the district; he would meet with district personnel to discuss the planning set up in the district and took care of the writing of manual material which he had never done before as a load dispatcher; and that he had authority now to man the district where before it was necessary for him to call the district supervisor and recommend that it be manned. Furthermore, that the T & D Supervisors are the only people that are available and capable of operating the distribution system of the Company during the weekends and on all shifts other than the daylight shifts. They are the only people in the Company that train and determine switching eligibility for lines and substations and the only ones that can handle customer compliants on all shifts, other than the daylight shift, with the complete authority to reconnect customers, if they so choose.

A fair assessment here finds the Board's order unsubstantiated, in considering the record as a whole. That record discloses that the new position of T & D Supervisor embodies a new concept in the authority to be exercised over and above that which was done previously by the load dispatchers at Charleroi and Springdale and, additionally, that it shows the new duties and responsibilities entailed in the position require the exercise of independent judgment and, in most instances, the authority to responsibly direct the individuals under their control.

Accordingly, it is Ordered, Adjudged and Decreed,

(1) That the Board's certification entered November 7, 1962, be vacated and set aside to the extent that the T & D Supervisors were to be included in such

bargaining unit; (2) That the finding of the Board dated August 12, 1963, that the petitioner was guilty of unfair labor practices in refusing to bargain with the representatives of a unit which included all T & D Supervisors is likewise vacated and set aside; and (3) That the Board's order for enforcement of the same dated August 12, 1963, is herewith denied.