**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GREENFIELD COMPONENTS CORPORATION, Respondent.**

No. 6033.

United States Court of Appeals First Circuit.

May 10, 1963.

Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Seymour Strongin, Atty., Washington, D. C., were on brief, for petitioner.

Sidney A. Coven, with whom Joseph E. Lepie and Melvin Pierce, Boston, Mass., were on brief, for respondent.

Before HARTIGAN and ALDRICH, Circuit Judges, and GIGNOUX, District Judge.

HARTIGAN, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order against respondent, a Massachusetts corporation engaged in the manufacture of electronic components, following the usual proceedings under the Act. The Board found that respondent had violated Section 8(a) (1) and Section 8(a) (3) and (1) of the Act by means of various coercive and discriminatory conduct towards its employees, and further found that respondent violated Section 8(a) (5) and (1) of the Act by refusing to bargain in good faith with the Union, which represented a majority of respondent's employees. Initially, in its petition for enforcement, the Board asked that its entire order— embracing all the foregoing asserted violations—be enforced. Respondent has since complied with the portion of the order based on the Board's findings that it violated Sections 8(a) (1) and 8(a) (3) of the Act. Consequently, the Board now seeks enforcement of only the Section 8(a) (5) provision of the order.

The facts germane to this charge are as follows: In May 1960 the Union[1] began a campaign to organize respondent's employees. With varying degrees of intensity, this campaign continued until February 20, 1961. On this date, one Murdock, the Union's district representative, telephoned Francis J. Sweeney, respondent's president, stating that he was formally notifying him that the Union represented a majority of respondent's employees. Murdock offered to prove the factual basis of this claimed majority, and requested recognition for the pur-

Allison W. Brown, Jr., Attorney, Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L.

---

1. United Electrical, Radio & Machine Workers of America.

pose of collective bargaining. Sweeney requested that Murdock send him a letter incorporating the substance of their conversation and on that same day, Murdock notified respondent by letter that the Union represented a majority of its employees within the appropriate bargaining unit.[2] The letter again requested a meeting for the purpose of negotiating an agreement covering wages, hours, and other conditions of employment. In this letter, Murdock offered to submit to a mutually agreeable third party evidence of the Union's majority designation.

By letter dated February 24, 1961, signed by president Sweeney, respondent replied to the Union as follows:

"It is the position of Greenfield Components Corporation that unless and until your union has been duly certified by the National Labor Relations Board as the bargaining representative of the employees at our plant, the Company will not meet with your representatives for the purpose of negotiating a contract."

Respondent has continued to adhere to this position since the sending of the above letter.

The Board found that on February 20, 1961, the date of the Union's initial request for recognition and bargaining, there were seventy-nine employees in the unit, and that on that date the Union had forty-one validly executed authorizations. Under these circumstances, the Board concluded that respondent violated Section 8(a) (5) and (1) of the Act in refusing the Union's request to recognize and bargain with it as the majority representative of its employees except upon certification by the Board.

Although the Board cited no authority in reaching this result, its opinion as well as the Board's position in this court is apparently predicated on a line of cases of which N. L. R. B. v. Gorbea, Perez & Morell, S. EN C., 300 F.2d 886 (1st Cir. 1962) and N. L. R. B. v. White-light Prod. Div. of White Metal Rolling & Stamping Corp., 298 F.2d 12 (1st Cir. 1962), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 are illustrative in this circuit. The thrust of these cases is that a company's refusal to deal with a union—except upon an election—after it has been correctly informed that a majority of its employees had signed union authorization cards, prima facie warrants a violation of Section 8(a) (5).

It is to be noted that in each of the above cases, the record indicates that the Union had authorization cards from a clear cut or substantial majority of the relevant employees, whereas here the majority status of the Union—even on the Board's own count—is of the razor thin variety. As a matter of logic, the more tenuous the majority status of the union, the more reasonable is the inference that the company entertained a good faith doubt as to this status and, consequently, the more reasonable its refusal to meet with the Union except upon certification. However, in the instant case, the respondent has pitched its defense on the attempt to show that the Union never possessed a *de facto* majority of its employees on the critical date quite apart from any question as to whether respondent entertained good faith doubts as to the majority status. In respondent's words, the issue is: "whether substantial evidence on the record as a whole supports the Board's finding that the Union had been validly authorized by a majority of Respondent's employees in the unit involved to represent them for purposes of collective bargaining." In short, the case has been argued on the basis that if the Union did possess a factual majority of the respondent's employees on the critical date, then the Board was correct in sustaining the charge of a refusal to bargain. Conversely, if this factual majority was absent, the Board was wrong in finding a violation of Section 8(a) (5) and (1).

It is respondent's position that the Board in finding that there were seventy-

2. There is no dispute that respondent's production and maintenance employees comprise the appropriate unit.

nine employees in the unit, excluded two individuals whom respondent contends should have been included, while in finding that the Union had been validly designated by forty-one employees, the Board erroneously counted certain authorization cards which—for various reasons to be cited hereafter—should not have been counted in determining the question of union majority. We turn to these contentions.

■ One Charlie Jones was excluded from the unit on the ground that he was a "supervisor" within the meaning of the Act and respondent challenges this determination. Jones is a member of respondent's sealing (furnace) department—a department in which one of respondent's major production processes is performed. In addition to Jones, eight or nine women worked the evening shift in the sealing department—with hours from 3 p. m. to 11 p. m. This department is located on the lower floor of respondent's plant and the record indicates that the plant's night foreman—one Erwin Price—spent relatively little time there. Jones was required to report to work early to receive instructions from the day shift foreman—one Host—who normally left the plant at 5 p. m. Host's conversation with Jones included directions regarding the product to be produced and the employees who should do particular work. Jones, however, had some discretion in the assignment of work and he was responsible for the quantity and quality of production on the evening shift. Jones also transferred production data from the employees' time slips to Host's production records, and also was responsible for maintaining production sheets on his samples and re-runs. The record indicates that Jones had authority to transfer an employee from one type of work to another without securing permission from anyone. He disciplined employees who loafed or were quarrelsome, and had authority to permit an employee to leave the plant for cause. Finally, evidence from second shift employees who testified at the hearing was clear that they recognized Jones as their supervisor. And, indeed, there was testimony that respondent's vice president Sauter told the employees on the second shift who worked in the sealing department that Jones would be in charge nights and that the "girls would take the orders from him." Upon a consideration of the record as a whole, we conclude that substantial evidence supports the Board's finding that Jones was a supervisor within the meaning of the Act and consequently should have been excluded in any determination of the appropriate bargaining unit. See, N. L. R. B. v. Southern Airways Company, 290 F.2d 519, 523–524 (5th Cir. 1961); cf., N. L. R. B. v. Quincy Steel Cast Co., 200 F.2d 293, 295–296 (1st Cir. 1952).

■ The next employee whose status is questioned by respondent is one Robert Bostley. The Board found that Bostley was a part-time, specialized employee, with no community of interest with the production employees, and that, therefore, he was not a member of the appropriate unit. The record indicates that Bostley was a full-time employee of another company located in the same town as respondent's plant. Respondent paid him a salary of $15 a week to test the chemical solutions in its plating department after his regular working hours at his principal place of business. Bostley merely reported his findings to the plating room foreman; he performed no other duties for respondent. President Sweeney testified that the salary or fee that was paid Bostley was "an inducement for him to keep himself available at our convenience. * * * He is in frequent telephone contact with us and we will call him in and [he] comes by regularly."

The record shows that in the twenty-one weeks from January 1 to May 20, 1961, Bostley worked for respondent less than three hours per week during seventeen weeks. In the other four weeks he worked a total of six hours during one week and an aggregate of four hours during the remaining three weeks.

■ To be sure, the number of hours which a worker puts in on the job will not of itself be decisive of inclusion or exclusion from a given unit. Cf., N. L. R. B. v. Joclin Mfg. Co., 314 F.2d 627 (2nd Cir. 1963). It is but one factor—albeit a highly relevant factor—in the total assessment of whether the individual has that requisite community of interest with other employees in the pertinent unit to warrant his inclusion.

Here, Bostley's status obviously is unique and somewhat hybrid—somewhere between a "technical" employee as that term is defined in the Act, see, Armour and Company, 119 N.L.R.B. 623 (1957), and that of an independent contractor performing his services as needed on an irregular part-time basis, while engaged full time for another employer. Nonetheless, we believe that, in the final analysis, Bostley was cast more in the role of the *ad hoc* specialist than the employee whose continuing and on-going relationship to, and identity with, the mainstream of the appropriate unit warrants his inclusion therein. The Board's conclusion that Bostley was not part of the production unit was reasonable and fully consonant with prior Board decisions. See, Armour and Company, supra; United States Gypsum Company, 119 N.L.R.B. 1415 (1958); American Broadcasting Co., 117 N.L.R.B. 13 (1957); Anderson's Super Service, Inc., 120 N.L.R.B. 583 (1958).

■■ Next, respondent contends that eight of the Union's authorization cards were signed by employees in the early stages of the Union's organizational drive—in May or June 1960—and consequently were "stale" in February 1961, when the Union made its demand for bargaining. While there is indication that the intensity of the Union's organizational campaign diminished somewhat during the summer months of 1960, there was substantial evidence that there was no hiatus or lack of continuity in the organizational efforts and we have no hesitation in concluding that the cards signed in May and June, 1960 were part and parcel of the same organizational campaign which culminated in the demand for recognition on February 20, 1961.

Moreover, the record is barren of evidence that any of the card signers of May and June, 1960 ever informed the Union that they desired to repudiate or revoke their designation of the Union as bargaining agent. As the trial examiner correctly pointed out, this fact distinguishes the present situation from the case of Grand Union Co., 122 N.L.R.B. 589 (1958), relied on by respondent. For, in the Grand Union case, contrary to respondent's position, it was not the mere passage of time or "staleness" that was decisive, but the fact that the five employees whose cards were in dispute testified affirmatively at the hearing that they did not want the union to represent them at the time of the second organizational campaign there at issue. Here, none of the employees who had signed cards in the early stages of the organizational campaign repudiated their authorization even though at least two of them were called as witnesses for the General Counsel. In this type of situation, where an employer asserts that a card signed by a worker at an earlier date does not reflect his present intention, we believe that the burden to show this change of mind should properly rest on the employer. Suffice it to say that respondent has made no such showing here.

■ Finally, respondent asserts that certain of the cards should have been excluded because of evidence that some of the employees did not understand what they were doing when they signed the union cards. However, the cards were entirely devoid of ambiguity and admitted of no misunderstanding. As we have stated previously: "The employees were not illiterate. There was no claim of affirmative misrepresentation by the union. The Board was justified in accepting the cards at their face value and rejecting the oral testimony that the employees had thought they meant something else." N. L. R. B. v. Gorbea, Perez & Morell, S. EN C., supra, 300 F.2d at 887.

For the foregoing reasons, we believe that the Board was correct in determining that, at the time of the request to bargain, the union represented a majority of the employees in the appropriate unit and that respondent's action in conditioning bargaining on a Board certification was violative of Section 8(a) (5) and (1) of the Act.

A decree will be entered enforcing the order of the Board as to the Section 8(a) (5) provision.