**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**J. W. MAYS, INC., Respondent.**

**No. 76, Docket 29497.**

United States Court of Appeals
Second Circuit.

Argued Nov. 12, 1965.

Decided March 2, 1966.

694

Leonard M. Wagman, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, NLRB, on the brief), for petitioner.

Seymour W. Miller, New York City (Miller & Seeger, New York City, on the brief), for respondent.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

The National Labor Relations Board petitions under § 10(e), 29 U.S.C. § 160(e), for enforcement of its order against respondent Mays. The Board found that Mays violated § 8(a) (1) of the National Labor Relations Act by

threatening employees with loss of employment if they engaged in union activities, and by offering an employee inducements to abandon union activity, and that the company violated § 8(a) (3) and (1) of the Act[1] through discriminatory discharges and transfers. It ordered Mays to cease and desist from the violations, with provisions for reinstatement and back pay, and the usual record keeping and notice posting. 147 NLRB No. 104. We hold the findings supported by substantial evidence on the record as a whole except as to employee Richardson, modify to strike the portion of the order referring to her, and the reference to "any other labor organization," and as modified order enforcement of the Board's order.

Early in February 1963, the union began organizing respondent's store and warehouse in Brooklyn, New York. Union meetings were attended by a supervisor, Wolf, who expressed an interest in unionization of his class of employees. When the union did not show any interest in Wolf, he aligned himself with the company. He had been accompanied to the meeting by four employees, Filosa, Reid, Cohen, and Cecero. Within three days after the meeting, all four were discharged or laid off. Additionally, one employee, Segarra, recently rehired, was fired one-half hour after being seen handing out union cards, and after the warehouse manager, Kromash, pointed him out and said, "That's the kid that's handing out the union cards."

Later, Cohen, while engaged in picketing, entered the store and was told by Katz, the General Manager, "I had a lot of promise for you * * * We had a lot of things in store for you," and that if he would abandon the picket line, "We will see about taking you back in a better position."

Buckley, an employee at respondent's Massapequa store, signed a union card, distributed others, and then met with union officials, where he was seen by a company salesman, brother-in-law of the board chairman, who reported the incident to supervisory personnel. The employee was discharged that night, and was told that his work was all right, "but you have been seen and reported talking to the union men."

After signing a union card and picketing, employee Richardson was transferred to another department, and promptly said, "I quit," and submitted her resignation. She believed the transfer was designed to curb union activity. After putting up union posters, and joining a picket line, another employee, Portas, was told her work was unsatisfactory, and that she was being transferred. She refused, and eventually was discharged.

After two employees at the Massapequa store signed union cards, one consulted Military, a minor supervisor, who advised them not to let his superior, Picone, see them, and they tore up the cards.

The Board's order affirmatively requires reinstatement, with back pay except for Richardson, of all employees discharged or transferred, and includes cease and desist provisions.

The first issue is the discharge of the four employees who attended the meeting. All worked in the warehouse receiving department, managed by Kromash, with, in order of authority, Tabroff, Rosenberg, and Wolf under him. Wolf was the one who attended the meeting with the four, and who was claimed to have reported the meeting to his superiors.

The NLRB case for a discriminatory discharge of these four employees de-

---

1. "Sec. 8(a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
 * * * * *

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization :"

pends to a high degree on an alleged admission by Tabroff to Segarra. Segarra testified that he noticed while standing near a window with Tabroff that Reid, Cohen, Filosa, and others were passing out union cards. He said, "There is Benny [Filosa]," and Tabroff said, "Yes." Segarra asked why Filosa had been fired, and Tabroff, pointing down to them, said, "For that." Segarra asked, "Isn't it against the law to fire people for joining the union?," and Tabroff replied, "Yes, but we fired them for a different reason." (The Trial Examiner concluded he meant "him," not "them.")

The NLRB case on this issue rests, first, on the timing of the discharges; second, on the knowledge by Kromash, who did the firing, that they had attended the meeting, that is, on a finding that Wolf reported, and that the report reached Kromash prior to the discharges; third, on the Tabroff admission (specifically as to Filosa, and by extension to the others); and fourth, on the statement by Katz to Cohen, also alleged to be an § 8(a) (1) violation, to the effect that the management had high hopes for him.

 Timing alone is an inadequate support; and as to the second element of the NLRB case, the Trial Examiner's finding that Wolf reported, and that Kromash knew of the meeting, does not appear to arise out of any evidence except disbelief of Kromash and Wolf, and belief in Segarra's testimony concerning the Tabroff admission. The Katz-Cohen conversation may show attempted inducement to abandon union activities, but it does not argue forcefully for a § 8(a) (3) violation, except incidentally to show hostility to the union.

Respondent, moreover, forcefully contends that there are legitimate reasons for the discharge. With respect to Filosa, it appears that the third floor, his responsibility, had been found "a shambles" on previous occasions, that Katz found this condition again, and Kromash discharged Filosa. Reid was chronically absent, and was warned that he would be fired if he missed another Saturday; before the next Saturday, after missing a Monday night (to attend the meeting), he was fired by Kromash, who was not a party to the previous warning, and refused to be bound by it. Cohen was allegedly fired for loitering after receiving permission to leave early for illness and Cecero was laid off for lack of work without any replacement being obtained.

Although the Examiner might have been justified in crediting Reid's testimony that he never agreed to work on the Monday night of the meeting and could have concluded that Cohen was fired for his union activity, the Tabroff admission is crucial to the NLRB case. See NLRB v. Great Eastern Color Lithographic Corp., 309 F.2d 352 (2 Cir. 1962). Respondent claims that the admission is incredible, that Sagarra was a known union supporter, and that Tabroff never would have made such an admission, even in an attempt to persuade Segarra to abandon his pro-union position. (The admission is the basis of an § 8(a) (1) violation.) But such a motive, to dissuade Segarra from pro-union views, could well explain the admission. Respondent attacks certain underlying facts of the admission: it was too dark to see who was below, or what they were doing; testimony by union sympathizers indicates union cards were not passed out at the time of the admission, and those supposedly seen were not passing out handbills either; and it appears that Cohen, one of those whom Segarra says he and Tabroff observed, may have been absent then; there was no evidence to show that Tabroff knew or had any reason to know why Kromash fired Filosa and the other union men.

 This turns on credibility and cannot be said to be unsupported by the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The Tabroff admission, central to the whole issue, is not without doubt, but the Trial Examiner gave convincing reasons, based on the corroborating testimony of the discharges, to support his crediting Segarra and discrediting or ignoring any impeaching

testimony, even though he did not rely on Segarra's demeanor. And the Board agreed. We find no reversible error here.

The next issue is the discharge of Segarra. This, again, depends in part on a statement which Segarra testified was made by management (Kromash), indicating motive of the company. Respondent again points to factors making this testimony less credible: that Kromash would have no reason to say what he did in Segarra's hearing, and would not be likely to associate with him; that the firing was amicable; that Segarra admitted lying previously, to get time off. The Trial Examiner said he relied on the fact that Segarra's story was not likely invented, since all the witnesses included in it were most unfavorable, and on the fact that Segarra was likely to be honest in his testimony, since he admitted he was a liar. While neither of these reasons is very impressive, the testimony is not necessarily incredible.

Furthermore, the Trial Examiner did not credit the reasons offered by the company for the discharge of these employees. As for Segarra, the Trial Examiner noted that he was given a $5 "merit increase" at a time his work was alleged to have been unsatisfactory; respondent's claim that this increase resulted solely from the arrest of a thief in the store caught by Segarra, is not any more believable. The Examiner found that Segarra was not a model employee, but was tolerated, and only fired after his union activities became known.

The next issue is the discharge of Buckley. In this issue, like the other discharges, a statement of company intent is central testimony. Here it is the statement by Serpenti, a personnel officer, to Buckley, that he was being fired not for unsatisfactory work, but because he had "been seen and reported talking to the union men." Respondent claims this testimony was greeted by laughter, but it was credited, and is not inherently improbable. Furthermore, as the Examiner noted, the reason offered for the discharge, that his duties were over, con-

flicts with the testimony that he was kept on three more weeks after these duties ended, and with testimony that other jobs were assigned him.

The next issue is the transfer of Richardson and Portas, shortly after each picketed. The Trial Examiner credited Richardson when she testified that her shortcomings in her job were not of recent development, and disbelieved Kromash's statement that the transfer was for reasons of recent deterioration in her work.

Concerning Portas, the Trial Examiner concluded that Kromash decided on her transfer after rather than before she engaged in picketing, of which Kromash was aware. Kromash had denied all. Portas' record was excellent. She had just returned from a one-month vacation. Kromash testified that he first noticed a change in her work the day she returned, not the day after she picketed. Even this seems to be a suspect ground for transfer in view of her excellent record. And Kromash vacillated in determining when he first noticed a change in her work. The Trial Examiner said that Kromash was nervous in testifying.

With respect to the discharges, the Trial Examiner credited the Tabroff admission, and this supports a finding that Kromash had knowledge of the union meeting. While it is true that admissions made by management to known union sympathizers are "suspect," as respondent says, they are not wholly unbelievable.

A more troublesome issue is presented concerning the reinstatement of Richardson, who quit immediately after being told of her transfer. The Trial Examiner and Board concluded that this amounted to a constructive discharge, in violation of § 8(a) (3) because discriminatory. An employee faced with a discriminatory transfer even to a more desirable job need not file with the Board, and may, like Portas, resist and be discharged. South Bay Daily Breeze, 130 NLRB 61, enforced as modified NLRB v. Southern California Newspapers, 299 F.2d 677 (9 Cir. 1962). The

discharge violates § 8(a) (3) if a significant motive for the transfer was union activity. Richardson testified to the effect that she quit because she was resisting the company's efforts to transfer her for union activity. The order, insofar as it reinstates her, may not be enforced. Her own suspicion of company intent is not enough. She should have resisted and been discharged. Since any violation requires a finding of company intent, the better policy is to require that the employee await a discharge, if any, especially where, as here, the Richardson incident preceded the Portas discharge, and Richardson thus could not reasonably predict discharge.

The next issue is the § 8(a) (1) violations. The first example is said to be the Tabroff admission. Certainly a description of past conduct can also be a threat of future action. NLRB v. Electric Steam Radiator Corp., 321 F.2d 733 (6 Cir. 1963). The limits on the review of the Board's inferences from facts appear to be the same as on the review of the facts, NLRB v. Marcus Trucking Co., 286 F.2d 583 (2 Cir. 1961); NLRB v. Nevada Consolidated Copper Corp., 316 U.S. 105, 107, 62 S.Ct. 960, 86 L.Ed. 1305 (1942). If the inferences may reasonably be drawn, we may not substitute other inferences even though equally reasonable.

The second and third examples said to be violations of § 8(a) (1) are more clearly violations. They are the Katz-Cohen conversation and the warning or advice by Military that discharge would result if Picone, Receiving Manager, saw the union cards. The Katz-Cohen conversation raises only questions of credibility. The Military advice raises two issues.

First, it does not appear that a court has passed on the question whether advice by a minor supervisor that his supervisor would take action can be an § 8(a) (1) violation. The Examiner found that the necessary and foreseeable effect of the advice was to make the employee feel he was likely to be discharged for engaging in union activities. Perhaps a critical factor would be the manner in which the advice is given; as to this the Examiner is in a better position than the Board or a reviewing court.

Second, there is a dispute concerning Military's status. Unlike the employees, Military did not punch a timeclock, was salaried, and had about 50% higher rate of pay. His duties included requesting extra help, and assigning and recommending overtime, and instructing employees concerning work assignments. This is enough to make Military a supervisor.

Respondent claims that the Examiner's questioning of witnesses and reopening of the case amount to bias. In A. O. Smith Corp. v. NLRB, 343 F.2d 103 (7 Cir. 1965), on which respondent relies, the court appears to have focussed especially on the use of intemperate or emotion-charged words. In any case, the court concluded that the bias, as demonstrated in the intermediate report, was not such as to require a new hearing. No such bias was shown here, in any degree.

Respondent claims the order is too broad, relying on Communications Workers of America, AFL-CIO v. NLRB, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896, where the order required the unions to cease and desist restraining or coercing employees of a certain firm or "any other employer," and the Court deleted "or any other employer" because the unions' activities which led to the order had been directed exclusively at the one employer. We agree that the order here is likewise too broad. Here acts directed against other unions are not shown, and the order should be correspondingly narrow.

The order is modified by eliminating in parts 1(a) and (c) of the order the words "or in any other labor organization" and from Appendix A attached thereto the name Frances Richardson, and as modified is ordered enforced.