NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

DUNKIRK MOTOR INN, INC., d/b/a
Holiday Inn of Dunkirk-Fredonia,
Respondent.

No. 48, Docket 75–4020.

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1975.

Decided Oct. 14, 1975.

Jane P. Schlaifer, Atty., Washington, D. C. (Allison W. Brown, Jr., Atty., Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Assoc. Gen. Counsel, Elliott Moore, Dep-

uty Assoc. Gen. Counsel, N. L. R. B., Washington, D. C., on the brief), for petitioner.

John B. Drenning, Buffalo, N. Y. (Moot, Sprague, Marcy, Landy, Fernbach & Smythe, Buffalo, N. Y., on the brief), for respondent.

Before LUMBARD, MANSFIELD and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

The N.L.R.B. has petitioned for enforcement of its order of November 22, 1974, 215 N.L.R.B. No. 29, former Chairman Miller dissenting, directing the Dunkirk Motor Inn of Dunkirk, New York[1] to cease and desist from its violation of Sections 8(a)(1) and (5) of the Act. We are, however, constrained to agree with the Company that Local 34 of the Amalgamated Meatcutters and Butcher Workmen of North America (the Union) was prematurely certified as bargaining representative. Consequently, we hold that Dunkirk's duty to negotiate in good faith had not yet attached and, accordingly, deny enforcement.

A consent election was conducted on May 11, 1973, among Dunkirk's employees in a stipulated bargaining unit. The initial tally resulted in a vote of 20 to 18 in favor of the Union, but Union challenges to five outstanding uncounted ballots placed the ultimate outcome in doubt.[2] These challenges were sustained on June 8, 1973 by the Acting Regional Director who, in an issued report, ruled that each of the excluded votes was cast by an ineligible supervisory employee and recommended that the Union be certified. In so finding, he overruled two objections to the Union's pre-election conduct which had been pressed by the Company.

Dunkirk thereupon filed exceptions as to three of the challenges and one of its objections. The Board, upon review, adopted the Regional Director's decision insofar as it overruled the Company's objection; it, however, remanded and ordered that a hearing be held on the status of the three contested workers. That hearing was conducted on October 25, 1973. The Hearing Officer found that John Straight was an employee whose vote should have been counted[3] but agreed with the Regional Director that Sandra Nichols and Ruth Hancock were supervisors within the meaning of the statute. These findings were accepted by the Board in a Supplemental Decision, 211 N.L.R.B. No. 56. Former Chairman Miller, in dissent, disagreed with the majority as to Ruth Hancock, whom he considered to be an eligible employee. The question is obviously critical since if either Hancock or Nichols or both were eligible and at least two uncounted votes (including that of Straight) were against the Union, the certification would be improper, 29 U.S.C. § 159(a).

■ Having unsuccessfully exhausted its opportunities for administrative review, the Company nevertheless made it plain that it had no intention of bargaining with the Union or providing it with any relevant information as a prelude to negotiations. This obduracy, a necessary prerequisite to judicial review of certification decisions, *Boire v. Greyhound Corp.*, 376 U.S. 473, 476–477, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964), led to the filing of the instant unfair labor practice charges on July 12, 1974. Dunkirk's only defense was to reiterate its belief in the invalidity of the election. In addition to disputing again the classification of Han-

---

**1.** The respondent does business under the name of Holiday Inn of Dunkirk-Fredonia.

**2.** The ballots challenged were those of John Abbado, Fleury Richmond, Sandra Ann Nichols, John Leslie Straight and Ruth Alice Hancock.

**3.** For reasons which are not clear to us, John Straight's ballot has not yet been opened although the General Counsel sought no review of his revised classification as an eligible employee. Apparently, the Board felt that since the Union enjoyed a two-vote victory margin, Straight's ballot could not have affected the result unless at least one of the other Union challenges was overruled on appeal.

cock and Nichols as supervisors, Dunkirk renewed its objection that the Union's offer prior to the election to waive all initiation fees until a contract had been ratified represented an improper inducement to the workers. The Board, relying on its earlier opinions, granted a summary judgment motion rejecting these claims.[4]

## INITIATION FEES

■ *N. L. R. B. v. Savair Mfg. Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), upon which the Company heavily relies, held that prior to a representation election, a Union is prohibited from offering to waive the initiation fees of all those employees who vote in its behalf. The Union in this case did not violate that proscription. Its proposed waiver was available equally to all workers—regardless of how they voted—and extended in time until the date of contract ratification rather than the date of certification. These distinctions are critical, as has been repeatedly recognized in numerous post-*Savair* decisions. See, e. g., *N. L. R. B. V. Con-Pac, Inc.,* 509 F.2d 270 (5th Cir. 1975); *N. L. R. B. v. Wabash Transformer Corp.,* 509 F.2d 647 (8th Cir. 1974). The course of conduct followed here represented a reasonably calculated response to the traditional management argument that the workers are being asked to support the Union before it has secured any benefits for them. *Amalgamated Clothing Workers v. N. L. R. B.,* 345 F.2d 264, 268 (2d Cir. 1965). It was not an impermissible inducement, nor did it lead to an artificially inflated image of Union support. *N.*

*L. R. B. v. Savair,* 414 U.S. at 277, 94 S.Ct. 495.

## CHALLENGED VOTES

■ The Board held, and we agree, that Sandra Nichols was a supervisor as that term is defined in Section 2(11) of the Act[5] and, as such, statutorily precluded from participation in the bargaining unit.[6] At the time of the election, she was one of two full-time hostess-cashiers at the motel's restaurant. Her responsibilities in that position included greeting and seating customers, handing out menus and accepting payment at the conclusion of the meal. She also assigned waitresses to their respective stations in the dining room, distributed their weekly pay checks and, in conjunction with the innkeeper, prepared their weekly work schedules. Most significantly, Nichols interviewed applicants for the job of waitress and was authorized to have them report to work without prior management approval—an authority which the record indicates was exercised on at least twelve occasions. These indicia of supervision amply support the Board's action in discounting Nichol's vote. See *N. L. R. B. v. Scoler's Incorporated,* 466 F.2d 1289, 1292 n. 3 (2d Cir. 1972).

■ We are troubled, however, by the similar invalidation of Ruth Hancock's ballot. A review of the records leads us to conclude that Hancock was an eligible employee whose duties and interests were compatible with those of other members of the bargaining unit. Her vote should have been counted.

**4.** Former Chairman Miller voted against the issuance of a cease and desist order, citing his earlier dissent to the Supplemental Decision upholding the certification.

**5.** Section 2(11) defines "supervisor" as

. . . any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to

recommend such action if in connection with the foregoing *the exercise of such authority is not of a merely routine or clerical nature* but requires the use of independent judgment." [Emphasis added]

**6.** Section 9 of the Act states that only "employees" are properly includible in the bargaining unit. "Employee" is defined in Section 2(3) as excluding "any individual employed as a supervisor."

The uncertainty as to Hancock's status has arisen from the fact that the level of her responsibilities has fluctuated during the course of her tenure at Dunkirk.[7] But, the ambiguities are largely resolved when the inquiry is focused upon the time of the election, as both parties concede it must be.

The Board's contention, simply stated, is that Hancock's duties as an assistant to Housekeeper Fitzpatrick required that she employ "independent judgment" in responsibly directing a staff of eight to fourteen maids. As support for this position, its Supplemental Decision stresses the fact that Hancock spent approximately one half of each working day reviewing the manner in which the rooms on one of the motel's two floors had been cleaned. However, the limited discretion involved in this task is routine in nature and insufficient, standing alone, to convert an "employee" into a "supervisor." *N. L. R. B. v. Magnesium Casting Co.*, 74 LRRM 2234, 2236 (1st Cir. 1970); *Janesville Auto Transport Co.*, 193 N.L.R.B. No. 26 (1971). And, while Hancock possessed the "authority to order maids to take corrective action," that authority was sparingly exercised. More frequently, Hancock would herself remedy any deficiencies which she found. To this end, she wore a uniform and carried with her the necessary cleaning equipment.

Furthermore, Hancock lacked the power to discipline an individual maid whose performance was repeatedly unsatisfactory. Her sole remedy in such a situation was to relay the information to the housekeeper, Leola Fitzpatrick. Such referral decisions hardly suggest a finding of supervisory status. *N. L. R. B. v. Magnesium Casting Co., supra.*

We are similarly unpersuaded by the Regional Director's emphasis on Hancock's participation in the process of interviewing job applicants. Although Hancock has occasionally sat in on such interviews during and since the spring of 1973, her self-described role is limited to "more or less try[ing] to make the [prospective employee] feel at ease." In addition, as a resident of the community, her opinion is sometimes solicited as to the applicant's reputation. The record is unequivocal, however, that throughout the relevant period, Hancock has had no authority to hire or fire. Innkeeper King, Housekeeper Fitzpatrick and Hancock herself all testified to that effect.[8]

In substance, the Board's ruling postulates a union of interests between Hancock and Fitzpatrick, concededly a supervisor, rather than between Hancock and the maids. We find no substantial evidence in the record to support such an alignment. Hancock wore a uniform while at work, as did the maids; Fitzpatrick did not. Hancock cleaned rooms, as did the maids; Fitzpatrick did not. Albeit computed on a weekly rather than hourly scale, Hancock's wages were roughly equivalent to those paid the maids; Fitzpatrick's salary was approximately twice as much. Moreover, Fitzpatrick received additional compensation in the form of room and board as well as life and major medical insurances; neither Hancock nor the maids received these fringe benefits.

■ We hold that Hancock's vote should have been counted in the May 11, 1973 election at the Dunkirk Motor Inn.

---

7. Ruth Hancock was hired as a maid on June 29, 1971 and in that capacity worked under the direction of housekeeper Leola Fitzpatrick. Just before her temporary transfer to another Holiday Inn in December, 1971, Fitzpatrick selected Hancock as her assistant. In Fitzpatrick's absence, Hancock was elevated to the job of acting housekeeper. During that period, her responsibilities were necessarily enlarged. However, Fitzpatrick returned to Dunkirk in February, 1973 and reassumed her former duties. The election was held May 11, 1973. Our concern is with Hancock's status during this final period.

8. Hancock's admission during cross-examination that "[u]nder Mrs. Fitzpatrick's order" she had directed applicants to report to work falls far short of a showing of independent authority to hire.

*La Ronde Bar & Restaurant, Inc.*, 145 N.L.R.B. No. 31 (1963). Until her ballot and that of John Straight are opened and tabulated, it is impossible to say whether or not the Union truly enjoys majority support among the workers. Since Dunkirk's obligation to bargain in good faith extends only to duly certified representatives, the Board's cease and desist order which it would have us enforce, lacks the requisite legal foundation. *Cf. Polymers, Inc. v. N. L. R. B.*, 414 F.2d 999 (2d Cir. 1969), *cert. denied*, 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970).

Accordingly, the case is remanded to the Board for further proceedings to count the ballots of Straight and Hancock and to enter such order as may be appropriate after a tally of the votes.

Enforcement denied.