## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## PORTA SYSTEMS CORPORATION, Respondent.

### No. 650, Docket 79–4169.

United States Court of Appeals, Second Circuit.

Argued Jan. 23, 1980.

Decided May 29, 1980.

Van Graafeiland, Circuit Judge, concurred in part and dissented in part and filed opinion.

---

William R. Stewart, Deputy Asst. Gen. Counsel, Washington, D. C. (Patricia Cornwell Matthews, Washington, D. C., of counsel), for petitioner.

Henry C. Woicik, Jericho, N. Y., for respondent.

Before OAKES, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

The National Labor Relations Board is here seeking enforcement of an order based upon findings of violations of § 8(a)(1) and § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(1), (3). Porta Systems Corporation, the employer, manufactures, sells, and distributes electronics and related products from its plant in Syosset, Long Island, where it employed approximately 160 to 170 production employees in January, 1977. At that time, one supervisor, Robert Dietz, had approximately 100 employees and four so-called "leadpersons" under his supervision, and another, Harry Taylor, had between 30 and 90 employees and one "leadperson" under his supervision.

A critical question in the case is whether these leadpersons were "supervisors" as defined in § 2(11) of the Act, 29 U.S.C. § 152(11).[1] This question is critical because several of the violations of § 8(a)(1) that were found by the Administrative Law Judge and sustained by the Board itself were based on acts by the leadpersons— warnings and threats, surveillance, participation in the preparation and circulation of an anti-union petition, and coercive interrogation of employees by pinning "vote no" buttons on them. The company is only

---

1. Section 2(11) states:

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

responsible for these acts if the leadpersons involved were "supervisors."

We are also presented with the question whether there is substantial evidence to support the finding that company Chief Executive Officer DeLuca created the impression, two weeks before the election was scheduled to take place, that an impending suspension of routine wage increases would be the fault of the union. Finally, there is a question whether the company violated § 8(a)(1), (3) of the Act by adopting and maintaining a ten-percent absentee discharge rule and discharging both pro-union and anti-union employees pursuant to that rule, while refusing to reinstate employees either because of their union activity or in order to discourage union activity.

## I. *Leadpersons as Supervisors*

There was substantial evidence of the following facts in the record. Leadpersons make work assignments to employees and see to it that the work is performed within a certain period of time. They also select employees to work overtime and in doing so consider the individual employee's capability. They train new employees. They have some authority to maintain plant discipline and they check for lateness and absenteeism, asking employees for explanations. They also criticize the performance of employees working with them and advise such employees' foremen. They also have keys to the plant. At the same time, the leadpersons spend much of their time working on the line, and their pay is not substantially greater than that of the other employees. They work a 40-hour week, punch the clock as the rest of the workers do, and are paid time and one-half for overtime. They do not have authority to hire or fire or to transfer a fellow worker from one job to another, nor do they attend the production meetings that are attended by foremen, members of the engineering staff, and officers of the company.

The Administrative Law Judge found that each of the leadpersons in question responsibly directs the work of the employees assigned to her, effectively recommends wage increases for the employees, disciplines them, and assigns them work "all in a manner requiring the exercise of independent judgment." He noted that his findings were "consistent with" the responsibilities as outlined in prehearing affidavits executed by the four leadpersons. He also discredited the subsequent testimony of the leadpersons disavowing those affidavits, because he found the witnesses "evasive, argumentative and entirely unconvincing in their demeanor."

Preliminarily, we note that the Board's findings in this area are entitled to "special weight," *Amalgamated Local Union 355 v. NLRB*, 481 F.2d 996, 999–1000 (2d Cir. 1973), *cert. denied*, 414 U.S. 1002 (1973), in light of the Board's expertise "in evaluating actual power distributions which exist within an enterprise," *NLRB v. Metropolitan Life Insurance Co.*, 405 F.2d 1169, 1172 (2d Cir. 1968). Yet, in *NLRB v. Monroe Tube Co.*, 545 F.2d 1320, 1324–25 (2d Cir. 1976), despite the fact that the night foreman in question was responsible for eight people on the night shift and there was frequently no one of higher authority when he was there, and despite the facts that he was empowered to move employees from job to job when necessary, earned thirty percent more than the other employees in the shift, and was regarded by the night shift employees as their supervisor, this court reversed a Board determination that he was a supervisor. The court's holding was based on the fact that the night foreman did not attend weekly management meetings, he did not have an office or desk of his own, his instructions as to work priorities and scheduling were received from his foreman, and emergency personnel situations had to be reported to the latter. The court said that "his exercise of authority was of a strictly routine nature pursuant to [his foreman's] directions." *Id.* at 1325.

So the question turns ultimately on whether the powers of the leadpersons are exercised independently and in the interest of management thereby denoting a supervisory rank, or are exercised in a merely routine or clerical way. *See generally*

*NLRB v. Monroe Tube co., supra* ; *NLRB v. Big Ben Department Stores, Inc.*, 396 F.2d 78, 82 (2d Cir. 1968). Senator Flanders, who offered the final amendment that became Section 2(11), noted in the *Congressional Record* that "under some modern management methods, the supervisor might be deprived of authority for most of the functions enumerated and still have a large responsibility for the exercise of personal judgment." 93 Cong.Rec. 4677 (1947). A person "charged with the responsible direction of his department and the men under him," determining "under general orders which jobs shall be undertaken next and who shall do it," giving instructions for its proper performance and training in the performance of unfamiliar tasks, is above the grade of " 'straw bosses, lead men, setup men and other minor supervisory employees' " and has supervisory power. *Id.*

■ While the question is a very close one, judged by these standards, the finding of the ALJ that the leadpersons here were supervisors is supported by substantial evidence. A careful perusal of the record indicates that the findings are based upon testimony by the leadpersons and other employees, even though some of the former later disavowed affidavits given to Board counsel.

## II. *The CEO's Speech*

■ The evidence that the Chief Executive Officer attempted to create the impression that a withholding of wage increases would be the fault of the union is quite thin indeed, but nevertheless also sufficient to support the findings. The election was scheduled for February 25, 1977, and he gave a speech to three separate groups of employees on February 11, reading from a prepared text to the first two groups, but admittedly varying the prepared text in the third speech. He did not, however, admit making the impromptu statement, testified to by a single employee, that there could be no wage increases "because of the union being on the scene" or until after "the election came through for or against the union." He only recalled stating to the employees that the company "could not come out with a benefit program . . . because of the [possibility of] litigation surrounding the current situation," and insisted that his "current situation" remark was not referring to the union election campaign. The CEO's version is lent some support by the uncontroverted evidence in the record that no suspension of wage increases actually took place. But the ALJ found a violation, basing his finding as much on DeLuca's inability to remember and somewhat equivocal testimony as on the testimony of the single employee who described the speech but testified to two different versions of it. As we have said, the evidence is thin, but it is nevertheless substantial enough.

## III. *The Ten-Percent Absentee Discharge Rule*

The question under § 8(a)(3) is, of course, whether the employer has "by discrimination in regard to . . . tenure of employment . . . encourage[d] or discourage[d] membership in any labor organization." 29 U.S.C. § 158(a)(3). More specifically, the issue here is the support in the record for the ALJ's conclusion that the discharges of January 26, 1977 were not made solely for legitimate economic reasons, but because the company had an intent to discourage union activities by the employees. See *NLRB v. Advanced Business Forms Corp.*, 474 F.2d 457, 463–64 (2d Cir. 1973); *NLRB v. Long Island Airport Limousine Service Corp.*, 468 F.2d 292, 295 (2d Cir. 1972).

Prior to January 26, 1977, the employer had no standard policy with respect to the number of absences that would result in a discharge. Instead, the supervisors exercised their own judgment on an *ad hoc* basis, discharging those employees with an absentee rate considered unacceptable. On January 24 or 25, the employer held a management personnel meeting at which absenteeism, lateness, productivity, and employee drinking were discussed. The two foremen present, Taylor and Dietz, picked out those employee attendance sheets that indicated a

large number of absences. The company vice president then did some rough calculations and concluded that the percentage of absences for this group of nine employees was about ten, while some other employees had absentee rates that were slightly less. Following a conversation about the industry's acceptable rate of absenteeism, which is four percent, a decision was made to establish a discharge rule and to "double and then some" the industry average to ten percent for this company.

The company contends that the development of this new absentee policy was occasioned by the need to cut the absentee rate in order to meet a newly issued winter production schedule and the two foremen as well as the personnel manager testified to that effect. Yet, the new production schedule was passed out in the third or fourth week of December, according to one witness, and in early January, according to the other, while the meeting was not held until January 24 or 25. This was one factor prompting the ALJ to discredit the testimony asserting that the new rule was created in order to meet the newly issued production schedule. In addition, absenteeism historically had been a continuing plant problem. And the company controller offered an entirely different explanation of the rule. He testified that, before the advent of union activity, the company's practice was to discharge employees whenever their absentee records became too serious, but that the company halted this practice in mid-November, 1976 after the union began organizing, because it was uncertain of its rights. Thereafter, he said, the company was advised by counsel that it could continue to do business normally, so a meeting was called to evaluate the entire employee complement with its backlog of absenteeism problems. This testimony was obviously different from that of the supervisors and personnel manager. It is somewhat unconvincing in itself because, as the ALJ pointed out, the company did not revert to its normal practice of *ad hoc* discharges; it inaugurated an across-the-board discharge policy based solely on absentee percentages.

Three known and active union adherents, Christina Smith Porter, Christopher Porter, and Timothy Bradeen were discharged on January 26, along with six employees not known as active union supporters. One of the latter group was hired back on the basis of her statement that she had been ill. But one union adherent, Bradeen, was disparately treated in that he, too, had been ill on at least five occasions and these illnesses had been reported by his mother. With these five days excluded, his absentee rate was only eight percent, but in his case no consideration was given to illness excuses. In the case of Christopher Porter, the rough calculations were based on the assumption that he had been employed for 100 days, but in fact he had been employed for 110 days, so that his ten percent rate of absence should have been reduced to nine percent and he should not have been discharged. Other employees with nine percent absentee rates were not, in fact, terminated. Thus, the disparate treatment received by union adherent Bradeen and the inaccurate calculation of union adherent Porter's rate of absenteeism lend considerable support to the ALJ findings.

That the discharge rule was considered in company circles to have anti-union consequences and motivation is further demonstrated by some other evidence credited by the ALJ. There was testimony that, when supervisor Gutbrod learned in June, 1977 that employee Jones was going to the Labor Board, Gutbrod threatened to punish Jones by informing him that sooner or later, he would be on the "ten percent absentee list," *i. e.*, fired. Thus, the ALJ based his view that the discharge rule was intentionally discriminatory both on "the genesis of the rule . . . as an effort to chill unionism" and on "the implicit admission of Gutbrod to Jones . . . that this was the purpose of the rule."

The company contends, of course, that these employees were discharged for legitimate business reasons, but its discriminatory application of the rule cuts the other way. This was the biggest discharge of employees on one day in the company's

history. While it was by no means equal to the "power display in the form of a mass lay-off" in *Majestic Molded Products, Inc. v. NLRB*, 330 F.2d 603, 606 (2d Cir. 1964), the company did promulgate a new rule that resulted in the immediate discharge of nine employees, including three of the union's most active supporters, just one month before the Board's scheduled election. It is not necessarily dispositive here that six employees whose union sentiments were not known were discharged at the time, since that could be considered an attempt to appear consistent with the pretext for discharging the three known union adherents. *See NLRB v. Dorn's Transportation Co.*, 405 F.2d 706, 713 (2d Cir. 1969). Moreover, there is no indication that any of these employees were given prior warnings that their continued absenteeism might result in discharge and, as we said in *NLRB v. Montgomery Ward & Co.*, 242 F.2d 497, 502 (2d Cir.), *cert. denied*, 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957), the "abruptness of a discharge and its timing are persuasive evidence as to motivation." Of course, our enforcement of the Board's order does not preclude the company from adopting an absenteeism rule under circumstances that do not indicate a violation of the Act.

Petition to enforce granted.

VAN GRAAFEILAND, Circuit Judge, concurring in part, dissenting in part:

Before the enactment of the Taft-Hartley Act, when "supervisors" were sometimes treated as "employees" under the National Labor Relations Act,[1] supervisory employees in Jones & Laughlin Steel Corporation mines were organized by the United Mine Workers. Thereafter, the number of discipline slips issued by the supervisors decreased by two-thirds, and the accident rate doubled.[2] This was a graphic illustration of the unwisdom of allowing managerial personnel to become subservient to a labor organization whose members they were supposed to supervise.[3]

Believing that employers should be entitled to the undivided loyalty of managerial personnel, Congress amended sections 2(3) and 2(11) of the National Labor Relations Act (29 U.S.C. § 152(3) and (11) so as to exclude supervisors from the statutory definition of employee.[4] So that nonmanagerial employees would continue to enjoy the benefits of the Act, Congress took care to distinguish between employees vested with true management prerogatives such as the right to hire, fire, and discipline, or effectively recommend that those actions take place, and employees with only minor supervisory authority, such as straw bosses and set-up men.[5] A supervisor under the revised statute is a person whose natural alignment is with management.[6] He is a "representative of management",[7] a "part of management",[8] a person vested with "genuine management prerogatives".[9] He is generally a foreman or person of higher rank [10] who possesses "real power" to act in the interest of his employer.[11]

1. *See Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

2. *L. A. Young Spring & Wire Corp. v. NLRB*, 163 F.2d 905, 906 n.2 (D.C.Cir.1947) (quoting S.Rep. No. 105 S. 1126, 80th Cong., 1st Sess. (1947)), *cert. denied*, 333 U.S. 837, 68 S.Ct. 607, 92 L.Ed. 1121 (1948).

3. *Id.*

4. *See International Ladies' Garment Workers Union v. NLRB*, 339 F.2d 116, 122 (2d Cir. 1964); *Laborers & Hodcarriers Local No. 341 v. NLRB*, 564 F.2d 834, 837 (9th Cir. 1977).

5. *NLRB v. Security Guard Service, Inc.*, 384 F.2d 143, 147–48 (5th Cir. 1967).

6. *Id.* at 150.

7. *NLRB v. North Carolina Granite Corp.*, 201 F.2d 469, 470 (4th Cir. 1953).

8. *Laborers and Hodcarriers Local No. 341 v. NLRB, supra*, 564 F.2d at 838.

9. *International Ladies' Garment Workers Union v. NLRB, supra*, 339 F.2d at 121 (quoting S.Rep. No. 105, 80th Cong., 1st Sess. 4 (1947)).

10. *NLRB v. Southern Airways Co.*, 290 F.2d 519, 523 (5th Cir. 1961).

11. *Amalgamated Clothing Workers v. NLRB*, 420 F.2d 1296, 1300 (D.C.Cir.1969).

Although on occasion the borderline between supervisory and non-supervisory status may become somewhat indistinct,[12] one would expect this shadowy area to be relatively small and not to encompass the hundreds of cases that have plagued the Board and the courts since the 1947 statutory amendment. This expectation will never be realized, however, until the Board becomes consistent in its application of the standards of supervisory status contained in section 2(11). One need only contrast the Board's decisions in cases where the acts of an employee may be attributed to management as an unfair labor practice with its decisions in cases where the employee's activities may subject the employee himself to management sanctions to realize that consistency of application does not typify the Board's record to date. When the Board's decisions in bargaining unit cases are thrown into the hopper, inconsistency becomes even more apparent.

So that this opinion will not be unduly prolonged, many of the cases in which judicial review was sought have been listed in an appendix. A comparison of the decisions in the three areas covered will demonstrate the dissimilarities in the Board's approach and the manner in which the Board shifts emphasis among the indicia of supervisory status depending, to some extent at least, upon the purpose for which its appraisal is being made. This result-oriented method of fact-finding should come to an end.

The Board is obligated to administer the Labor Management Relations Act fairly and rationally and to act as an impartial and neutral referee, guarding the right of both employer and employee.[13] It should not act arbitrarily, nor "treat similar situations in dissimilar ways." [14] After thirty-three years of Board review, the time has come for sufficient certainty to be brought into the interpretation of sections 2(3) and 2(11) so that those for whom these sections have meaning need no longer act at their peril.

Because the Board's decision in the instant case is clearly inconsistent with its holdings in a number of prior cases,[15] and because I find no substantial evidence in the record as a whole establishing that the lead persons were part of management with real power to act in the interest of their employer,[16] I respectfully dissent from that portion of the majority opinion which holds to the contrary.

I concur in that portion of the majority opinion which upholds the Board's finding relative to the threatened withholding of wage increases and the improperly motivated discharge of workers under the ten percent absenteeism rule. I find absolutely no basis, however, for the Board's mandatory order that respondent Porta Systems must rescind its ten percent absenteeism discharge rule and may no longer enforce it. If any wrong resulted from the original enactment of the rule, it will be corrected by the rehiring order. After such correction, the continued existence and enforcement of the rule is a simple management

---

**12.** See Local No. 207 v. Perko, 373 U.S. 701, 706, 83 S.Ct. 1429, 1431–32, 10 L.Ed.2d 646 (1963).

**13.** Burinskas v. NLRB, 357 F.2d 822, 827 (D.C. Cir.1966); Florida Steel Corp. v. NLRB, 587 F.2d 735, 753 (5th Cir. 1979); Leonard v. NLRB, 205 F.2d 355, 357 (9th Cir. 1953).

**14.** Burinskas v. NLRB, supra, 357 F.2d at 827; see Local 777, Democratic Union Organizing Comm. v. NLRB, 603 F.2d 862, 871–72 (D.C. Cir. 1978); Jones v. Califano, 576 F.2d 12, 20 (2d Cir. 1978).

**15.** See, e. g., NLRB v. Harmon Industries, Inc., 565 F.2d 1047 (8th Cir. 1977); Laborers & Hodcarriers Local No. 341 v. NLRB, supra, 564 F.2d 834; NLRB v. Magnesium Casting Co., 427 F.2d 114, 116–118 (1st Cir. 1970), aff'd, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971); NLRB v. American Oil Co., 387 F.2d 786 (7th Cir. 1977), cert. denied, 391 U.S. 906, 88 S.Ct. 1656, 20 L.Ed.2d 420; NLRB v. Security Guard Service, Inc., supra, 384 F.2d 143; International Ladies' Garment Workers Union v. NLRB, supra, 339 F.2d at 121–33.

**16.** NLRB v. Monroe Tube Co., 545 F.2d 1320, 1324-25 (2d Cir. 1976).

decision with which the Board should have no concern.[17]

## APPENDIX

### ATTRIBUTED UNFAIR LABOR PRACTICE CASES

*NLRB v. Monroe Tube Co.,* 545 F.2d 1320 (2d Cir. 1976); *NLRB v. Broyhill Co.,* 514 F.2d 655 (8th Cir. 1975); *NLRB v. Sayers Printing Co.,* 453 F.2d 810 (8th Cir. 1971); *NLRB v. Brown Specialty Co.,* 436 F.2d 372 (7th Cir. 1971); *NLRB v. Gerbes Supermarkets, Inc.,* 436 F.2d 19 (8th Cir. 1971); *International Union of Elec. Workers v. NLRB,* 426 F.2d 1243 (D.C.Cir.), *cert. denied,* 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970); *Amalgamated Clothing Workers v. NLRB,* 420 F.2d 1296 (D.C.Cir.1969); *NLRB v. Henry Colder Co.,* 416 F.2d 750 (7th Cir. 1969); *Benson Veneer Co. v. NLRB,* 398 F.2d 998 (4th Cir. 1968); *NLRB v. Big Ben Department Stores, Inc.,* 396 F.2d 78 (2d Cir. 1968); *NLRB v. Roselon Southern, Inc.,* 382 F.2d 245 (6th Cir. 1967); *Betts Baking Co. v. NLRB,* 380 F.2d 199 (10th Cir. 1967); *NLRB v. Kolpin Bros. Co.,* 379 F.2d 488 (7th Cir. 1967); *Filler Products, Inc. v. NLRB,* 376 F.2d 369 (4th Cir. 1967); *NLRB v. Gary Aircraft Corp.,* 368 F.2d 223 (5th Cir. 1966), *cert. denied,* 387 U.S. 918, 87 S.Ct. 2032, 18 L.Ed.2d 971 (1967); *NLRB v. Rish Equipment Co.,* 359 F.2d 391 (4th Cir. 1966); *NLRB v. J. W. Mays, Inc.,* 356 F.2d 693 (2d Cir. 1966); *Jas. H. Mathews & Co. v. NLRB,* 354 F.2d 432 (8th Cir. 1965), *cert. denied,* 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966); *NLRB v. Bama Co.,* 353 F.2d 320 (5th Cir. 1965); *NLRB v. Elliott-Williams Co.,* 345 F.2d 460 (7th Cir. 1965); *NLRB v. Schill Steel Products, Inc.,* 340 F.2d 568 (5th Cir. 1965); *NLRB v. Houston Chronicle Publishing Co.,* 300 F.2d 273 (5th Cir. 1962); *NLRB v. Mt. Clemens Metal Products Co.,* 287 F.2d 790 (6th Cir. 1961); *Poultry Enterprises, Inc. v. NLRB,* 216 F.2d 798 (5th Cir. 1954); *NLRB v. Valentine Sugars, Inc.,* 211 F.2d 317 (5th Cir. 1954); *NLRB v. Syracuse Stamping Co.,* 208 F.2d 77 (2d Cir. 1953); *NLRB v. Chautauqua Hardware Corp.,* 192 F.2d 492 (2d Cir. 1951).

### EMPLOYEE SANCTION CASES

*NLRB v. Harmon Industries, Inc.,* 565 F.2d 1047 (8th Cir. 1977); *Laborers & Hodcarriers Local No. 341 v. NLRB,* 564 F.2d 834 (9th Cir. 1977); *Kaiser Engineers v. NLRB,* 538 F.2d 1379 (9th Cir. 1976); *Rose Porta-Plant, Inc. v. NLRB,* 404 F.2d 1180 (5th Cir. 1968); *NLRB v. Security Guard Service, Inc.,* 384 F.2d 143 (5th Cir. 1967); *NLRB v. Big Three Welding Equipment Co.,* 359 F.2d 77 (5th Cir. 1966); *NLRB v. Charley Toppino & Sons, Inc.,* 332 F.2d 85 (5th Cir. 1964); *NLRB v. Grigg's Equipment, Inc.,* 307 F.2d 275 (5th Cir. 1962); *Northern Virginia Steel Corp. v. NLRB,* 300 F.2d 168 (4th Cir. 1962); *International Union of United Brewery Workers v. NLRB,* 298 F.2d 297 (D.C.Cir. 1961), *cert. denied,* 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962); *NLRB v. Southern Airways Co.,* 290 F.2d 519 (5th Cir. 1961); *NLRB v. Fullerton Publishing Co.,* 283 F.2d 545 (9th Cir. 1960); *NLRB v. Cousins Associates, Inc.,* 283 F.2d 242 (2d Cir. 1960); *NLRB v. Southern Bleachery & Print Works, Inc.,* 257 F.2d 235 (4th Cir. 1958), *cert. denied,* 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575 (1959); *NLRB v. Osbrink,* 218 F.2d 341 (9th Cir. 1954), *cert. denied,* 349 U.S. 928, 75 S.Ct. 770, 99 L.Ed. 1259 (1955); *NLRB v. Beaver Metal Creamery, Inc.,* 215 F.2d 247 (3d Cir. 1954); *Precision Fabricators, Inc. v. NLRB,* 204 F.2d 567 (2d Cir. 1953); *NLRB v. Whitin Machine Works,* 204 F.2d 883 (1st Cir. 1953); *Red Star Express Lines v. NLRB,* 196 F.2d 78 (2d Cir. 1952); *West Texas Utilities Co. v. NLRB,* 195 F.2d 519 (5th Cir. 1952).

### BARGAINING UNIT CASES

*Exxon Pipeline Co. v. NLRB,* 596 F.2d 704 (5th Cir. 1979); *NLRB v. Detroit Edison Co.,* 537 F.2d 239 (6th Cir. 1976); *Global Marine Dev. of Cal., Inc. v. NLRB,* 528 F.2d 92 (9th Cir. 1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 83 (1976); *NLRB v. Dunkirk Motor Inn, Inc.,* 524 F.2d 663 (2d Cir. 1975); *GAF Corp. v. NLRB,* 524 F.2d

**17.** *Liberty Mut. Ins. Co. v. NLRB,* 592 F.2d 595, 603 (1st Cir. 1979); *Waterbury Community An-* *tenna, Inc. v. NLRB,* 587 F.2d 90, 96 (2d Cir. 1978).

APPENDIX—Continued

492 (5th Cir. 1975); *NLRB v. Metropolitan Petroleum Co.*, 506 F.2d 616 (1st Cir. 1974); *NLRB v. Doctors' Hospital of Modesto, Inc.*, 489 F.2d 772 (9th Cir. 1973); *NLRB v. Gray Line Tours, Inc.*, 461 F.2d 763 (9th Cir. 1972); *NLRB v. Sayers Printing Co.*, 453 F.2d 810 (8th Cir. 1971); *Arizona Public Service Co. v. NLRB*, 453 F.2d 228 (9th Cir. 1971); *Oil, Chemical and Atomic Workers International Union v. NLRB*, 445 F.2d 237 (D.C.Cir. 1971), *cert. denied*, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972); *NLRB v. Magnesium Casting Co.*, 427 F.2d 114 (1st Cir. 1970), *aff'd*, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971); *Westinghouse Electric Corp. v. NLRB*, 424 F.2d 1151 (7th Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970); *Food Store Employees Local 347 v. NLRB*, 422 F.2d 685 (D.C.Cir. 1969); *Illinois State Journal-Register, Inc. v. NLRB*, 412 F.2d 37 (7th Cir. 1969); *Pacific Intermountain Express Co. v. NLRB*, 412 F.2d 1 (10th Cir. 1969); *NLRB v. Metropolitan Life Ins. Co.*, 405 F.2d 1169 (2d Cir. 1968); *NLRB v. American Oil Co.*, 387 F.2d 786 (7th Cir. 1967), *cert. denied*, 391 U.S. 906, 88 S.Ct. 1656, 20 L.Ed.2d 420 (1968); *Warner Co. v. NLRB*, 365 F.2d 435 (3d Cir. 1966); *Powers Regulator Co. v. NLRB*, 355 F.2d 506 (7th Cir. 1966); *International Ladies' Garment Workers Union v. NLRB*, 339 F.2d 116 (2d Cir. 1964); *West Penn Power Co. v. NLRB*, 337 F.2d 993 (3d Cir. 1964); *Eastern Greyhound Lines v. NLRB*, 337 F.2d 84 (6th Cir. 1964); *NLRB v. Florida Agricultural Supply Co.*, 328 F.2d 989 (5th Cir. 1964); *Keener Rubber, Inc. v. NLRB*, 326 F.2d 968 (6th Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1337, 12 L.Ed.2d 297 (1964); *NLRB v. Greenfield Components Corp.*, 317 F.2d 85 (1st Cir. 1963); *NLRB v. Swift & Co.*, 240 F.2d 65 (9th Cir. 1957); *NLRB v. Esquire, Inc.*, 222 F.2d 253 (7th Cir. 1955); *NLRB v. Stewart*, 207 F.2d 8 (5th Cir. 1953); *NLRB v. North Carolina Granite Corp.*, 201 F.2d 469 (4th Cir. 1953); *NLRB v. Quincy Steel Casting Co.*, 200 F.2d 293 (1st Cir. 1952); *Ohio Power Co. v. NLRB*, 176 F.2d 385 (6th Cir.), *cert. denied*, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949).